## GILLETT v. BOWEN.

*(Circuit Court, D. Colorado. 1885.)*

1. CORPORATIONS — TRUST RELATIONS BETWEEN OFFICERS AND CORPORATION — STOCKHOLDERS.

   While the officers of a corporation occupy trust relations to it, and in the faithful performance of such trusts they would indirectly subserve the interests of other stockholders, trust relations to the corporation do not, as to the stockholders, create trust relations *inter sese.*

2. SAME — TRUST NOT SHOWN — EVIDENCE.

   On examination of the evidence in this case, *held,* that no trust as between the parties is shown, and that the fraud charged is not proven.

In Equity.

*L. S. Dixon* and *Thos. Macon,* for complainant.

*Decker & Yonley,* for defendants.

BREWER, J. Out of the tangled and voluminous testimony in this case I have deduced these facts:

(1) In August, 1875, the San Juan Consolidated Mining Company was organized as a corporation, under the laws of the territory of Colorado, with a capital stock of 20,000 shares of $100 each; the corporators being the complainant, the defendants Bowen and Tankersley, and George M. Binckley. To this corporation these several corporators conveyed certain mining claims and properties owned by them, receiving in payment therefor, each, 3,875 shares of the stock. Subsequently, and during the fall of that year, the remaining 4,550 shares were, with the exception of five shares, issued to defendant Bowen and others for the purchase of other mining properties. The four corporators above named constituted the first board of directors. Defendant Tankersley was president; Binckley, vice-president; complainant, superintendent; and defendant Bowen, secretary and treasurer. These officers remained unchanged during the transactions which form the basis of this litigation. While the stock of this corporation was large, yet, until 1880, its value was wholly speculative, a mere guess at the undiscovered bowels of the hills, so much so that in 1879 defendant Tankersley sold to defendant Bowen 3,800 shares, and a note of $6,000, given by the corporation, for $1,000.

(2) Whatever trifling legal business—and it was but trifling—the firm of Tankersley & Bowen, or either of them, may have transacted for complainant and Binckley prior to the organization of the company, after that time, neither as a firm nor individually were they the attorneys of, nor did they occupy confidential relations to, complainant or Binckley. In their subsequent dealings with each other in respect to stock matters, these four corporators dealt at arm's length. I consider this an important fact, for if defendant Bowen, with whom this controversy really is, either individually or as a member of the firm of Tankersley & Bowen, was the attorney of or occupied other confidential relations to complainant or Binckley, then it

devolves upon him to show the good faith and sufficient consideration of the subsequent transactions, while if not, it devolves upon complainant to show the bad faith and lack of consideration. A good deal of testimony was introduced for the purpose of showing such confidential realations, but it seems to me of the weakest and most frivolous character. It is not pretended that there was any formal retainer, or that any fees were paid. Binckley claims that he had paid Bowen in advance, in that, 20 years prior thereto, he had, as editor of a country paper in Iowa, supported Bowen in a canvass for the legislature. He seems to think that such support gave him a permanent lien on Bowen's professional services, and established life-long confidential relations. Doubtless the parties were, at the time, friendly, and as friends confided in each other. They worked together in a common effort to develop the mining properties of the corporation in which they were stockholders. As officers of the corporation, they occupied trust relations to it, and in the faithful performance of such trusts they would indirectly subserve the interests of the other stockholders. But trust relations to the corporation do not, as to the stockholders, create trust relations *inter sese*. Whatever duties they owed to the corporation, as between themselves they dealt at arm's length, and neither had special charge of the other's interests. I fail to see any satisfactory testimony showing that Bowen was ever employed by Binckley or complainant, or ever acted as an attorney in respect to their stock or individual properties, or occupied any other confidential relations to them in respect thereto.

(3) On or about the twenty-eighth of October, 1875, a contract in writing was entered into between complainant, Binckley, and Bowen, on the one side, and Tankersley on the other, by which, in consideration of $500,000 of the stock of said company, to be delivered to Tankersley by the other parties, he agreed to purchase and put up, during the spring of 1876, on the property of said company, a 10-stamp mill and convey the same to the company. Of this $500,000 of stock, Bowen was to give $125,000, and Binckley and complainant the rest, in equal proportions. At the time, or within two or three days thereafter, Binckley and complainant gave $375,000 in stock to Tankersley, and this stock is the subject of the present controversy. Now, what was the effect of this contract as to the title to this stock? Obviously to vest it absolutely in Tankersley. He did not hold it as trustee. It was not placed in his hands to be used by him as their agent in procuring the mill. It was given to him in consideration of his procuring the mill. It was payment in advance. They relied on his promise, and if he failed to perform that promise their recourse, or that of the company, the beneficiary in the contract, was not upon the stock, but against him. This is the fair interpretation of the contract as, in the bill of complaint, it is charged to have been made. It is true, complainant and Binckley say that they understood that Tankersley was to return the stock if he failed to procure the mill, and Tankers-

ley says that when he got from them the stock, two or three days after the contract, he promised to return it if he did not get the mill. But this arrangement, if made, was an after agreement, not a part of the original contract, and unknown to Bowen. So far as that contract is concerned, the stock was to be immediately delivered, and according to Bowen's testimony was, in fact, delivered as payment in advance, and the parties trusted to Tankersley's promise and responsibility for the fulfillment by him of his agreement.

(4) Soon after this contract and the receipt of the stock, Tankersley went to Chicago to make arrangements for the mill. In so going, and while there, he was at some little personal expense, the amount of which is not disclosed; neither is any repayment of these expenses by the contracting parties or the company shown, save as by the arrangement hereinafter mentioned. He did not in fact procure any mill in Chicago, but about the first of January, 1876, was notified by Bowen by telegraph not to purchase any, because he (Bowen) had obtained in Denver a 30-stamp mill. He immediately came to Denver, and there an arrangement was, on the third day of January, made between himself and Bowen on the one side, and J. B. Chaffee on the other, for the erection of a 30-stamp mill. The contract between the parties is as follows:

### "Exhibit A.

"Memorandum of agreement made and entered into this third day of January, A. D. 1876, by and between Jerome B. Chaffee, of the city of Denver and territory of Colorado, party of the first part, and Thomas M. Bowen and Charles W. Tankersley, of the county of Rio Grande and territory aforesaid, parties of the second part.

"Witnesseth, that the said party of the first part, for and in consideration of certain stipulations and agreements hereinafter mentioned and agreed to by the parties hereto, has agreed, and does by these presents agree and bind himself, to furnish and erect, at a point to be selected by himself, and approved by the parties of the second part, in the Summit mining district, in Rio Grande county, in the territory of Colorado, a good thirty-stamp quartz-mill, complete and suitable for working gold ores, with proper machinery and steam-power for operating said mill and machinery for saving gold, together with a suitable building to cover said mill and machinery, the whole to be erected and completed at the cost and expense of the said party of the first part as early in the spring and summer of the year A. D. 1876 as is practicable, or the weather will permit.

"It is further agreed by and between the parties hereto that when said mill is completed and ready to operate, as hereinbefore mentioned, and in good running order, the said party of the first part shall have, and hereby has, the option to accept such propositions as the said parties of the second part may make, in full payment for said mill and machinery; or, in case of refusal to accept such proposition or propositions on the part of the said party of the first part, then the said party of the first part hereby binds himself to sell and deed to the said parties of the second part all of said mill and premises for their own free use and benefit, upon the following terms, to-wit: the first cost of said mill to be twelve thousand dollars, ($12,000,) and such other cost as may arise in transporting said mill from Gilpin county to the above-named location in Rio Grande county, and also all cost and expense in erecting the same, and putting the same in running order, and completing the same, and

also the building inclosing the same.   The terms of payment to be as follows,
to-wit:  The first twelve thousand dollars to be paid in quarterly payments at
the end  of each quarter from the day the said party of the first part shall de-
cline the proposition  or propositions made by the said parties of the second
part;  the remainder to be paid in quarterly payments in like manner, but dur-
ing the following year,—the said amounts to be put into notes in amounts cor-
responding with the payments as above mentioned, and signed by the said
parties of the second part, and drawing interest at the rate of eighteen per
cent. per annum from date until paid, and secured by trust deed upon said
mill and premises, and also by one-quarter of the paid-up stock of the San
Juan Consolidated Mining Company, a company organized under the laws of
the territory of Colorado and owning  mining property in the said Summit
mining district; said quarter of stock  in said company amounting to five
thousand dollars at par value; said stock  to be held by the said party of the
first part as additional security to said notes, and collateral thereto.

"It is further agreed that the  said parties of the second part shall furnish,
free of expense, to the said party of the first part, a good and suitable site
upon which to locate and erect said mill, deeding the same to the said party
of the first part at or before the  commencement of erecting the same.    The
said party of the first part agrees to keep accurate account of all cost and ex-
pense of transporting and erecting said mill and building, together with all
cost and expense of every nature, to put the same in good working condition,
and exhibit the same, with all proper vouchers attesting the same.

"In case the said party of the first part shall elect to sell the said mill, as
aforesaid, then said party shall deliver the same over to the said parties of the
second part upon a full compliance on their part of all the stipulations and
obligations relating to them herein contained.

"The proposition referred to in the foregoing, to be made by the parties of
the second part, shall be made by them to the said party of the first part in
writing, and at or within ten days from the time said mill shall be ready to
run.   In case of neglect or refusal to make such proposition, or in case of re-
fusal on the part of said party of the first part to accept said proposition, then
the said parties of the second part hereby bind themselves to take said mill
and premises, and pay for the same upon the terms herein named, and to ex-
ecute said notes and trust deed, and deliver the same to the said party of the
first part; and the said party of the first part shall thereupon deliver peace-
able possession of said mill and premises to the said parties of the second part.
In case said mill is not ready to operate by the first day of August, A. D. 1876,
then the third quarterly payment aforesaid shall be postponed, and not become
due until sixty days after said quarterly payment would have become due by
the maturity of said note.

"It is further agreed that the trust deed aforementioned shall provide that
if default be made in any payment when due and payable, it shall render the
whole amount of deferred payments due and payable, and notice shall be given
in said trust deed of thirty days for any foreclosure.   In case of neglect or
failure of either party to comply with the stipulations and conditions herein
mentioned, the other party shall not be bound by this agreement.   In case
of the death of either one of the parties of the second part a faithful compli-
ance by the other shall be binding upon the said party of the first part.

"Witness our hands and seals, at the city of Denver, Colorado territory,
this third day of January, A. D. 1876.

"JEROME B. CHAFFEE.     [Seal.]<br>
"THOMAS M. BOWEN.      [Seal.]<br>
"CHAS. W. TANKERSLEY."  [Seal.]

On the next day the stock named in said agreement, to-wit, $500,-
000,—$375,000 of which was, by the admissions in the pleadings,

the stock in controversy,—was turned over to Chaffee, and the following receipt therefor given:

"EXHIBIT B.

"(In duplicate.)

"Received of Thomas M. Bowen and Charles W. Tankersley five thousand shares, of one hundred dollars each, ($500,000,) of the stock of the San Juan Consolidated Mining Company, to be accepted as their proposition to me, as mentioned in an agreement dated January 3, A. D. 1876, between them and myself, or to be held by me as the collateral security mentioned in said agreement for the payments from said Bowen and Tankersley to myself, as I may elect to decide. J. B. CHAFFEE.

"*Denver, January 4, 1876.*"

It will be noticed that this contract was not made between Chaffee and the company, but between him and Tankersley and Bowen. The latter were not authorized by the company to make any such contract; did not assume to act for the company in respect to it; and were personally entitled to all the benefit, and liable for all the obligations, thereof. In short, it was a purely personal contract between them and him. Whether they should turn it over to the company, and if so, upon what terms, were matters to be decided subsequently, and upon proper arrangements with the company. The fact that they were officers of the company gave it no claim upon the contract.

(5) Soon after making this contract Bowen and Tankersley returned to Del Norte and advised complainant—Binckley being away—of its terms. During the spring and summer of 1876, Chaffee proceeded with his contract, removed the mill to San Juan county, and erected it on ground belonging to the company. Obviously all parties assumed that the mill was to become the property of the company, and that it was to provide for payment of the contract price. Yet Chaffee had not agreed to accept the company as purchaser, and Bowen and Tankersley had not turned the contract over to the company. They were waiting to make something out of the transaction for themselves personally. About the first of July, 1876, Chaffee came to Del Norte, the mill being nearly completed, to arrange for payment. The cost of removal and erection was found to be $20,000, which, with $12,-000, the first cost, made $32,000 due Chaffee. The situation was as follows: The company had entered into no contract and made no promises. Tankersley had contracted with Bowen, Binckley, and the complainant to put up a 10-stamp mill, and received from them $500-000 in stock as payment in advance. He had put up no 10-stamp mill. The company was the beneficiary in this contract. Chaffee had contracted with Bowen and Tankersley to put up a 30-stamp mill, and convey the same to them for $32,000, secured by their notes and deed of trust upon the mill and mill-site, and also by $500,000 in stock of the company. This stock he then held, it being the stock delivered to Tankersley under his contract. The mill had been put up on ground belonging to the company. After considerable negotiation it

was agreed between Chaffee, Bowen, and Tankersley that the mill should go to the company; that a deed of trust, on the entire property of the company should be executed to secure $32,000 of notes of the company payable to Chaffee; that Chaffee should take, in full payment of his claim, $20,000 of these notes, and the $500,000 of stock then in his hands as collateral; and that $12,000 of the notes should be given to Tankersley to be divided between him and Bowen in consideration of their turning the benefit of their contract over to the company, and in payment for their services in the matter; and that 10 of the stamps in the 30-stamp mill should be accepted by the company, the beneficiary, as a full discharge and satisfaction of the Tankersley contract. It is true, Tankersley denies any knowledge of, or participation in, any such arrangement; but the testimony overwhelmingly proves that his denial is not to be believed; that the arrangement was made as above stated; and that he was a party to it; and, further, that he received and retained $6,000 of the notes, and afterwards surrendered them to the company and received new notes therefor, the latter being the notes which, with his stock, he sold to Bowen in 1879. In addition to the positive testimony of witnesses, reference may be made to the novation contract signed by Chaffee.

## "Exhibit C.

"Know all men by these presents, that, whereas, on the third day of January, 1876, Jerome B. Chaffee entered into a contract with Thomas M. Bowen and Chas. W. Tankersley for the erection, in the Summit mining district, Rio Grande county, Colorado, of a thirty-stamp quartz-mill, complete, with machinery and steam-power for running the same; and, whereas, it has been agreed by and between said parties that said mill, machinery, and power shall be transferred and conveyed to the San Juan Consolidated Mining Company direct from said Chaffee upon the following terms, to-wit:   One-third of said mill, machinery, and steam-power being to satisfy and fill a certain contract existing, whereby said Chas. W. Tankersley agreed to erect on the property of said company a ten-stamp quartz-mill, for which said one-third of said thirty-stamp mill, machinery, and steam-power it is agreed that said Chaffee shall receive in full payment therefor the $500,000 of full-paid non-assessable stock of the said San Juan Consolidated Mining Company, now in his hands, received by him from said Bowen and said Tankersley, under said contract, dated January 3, A. D. 1876; and for this other two-thirds of said mill, machinery, and steam-power, the board of trustees of said company has agreed to pay said Chaffee the sum of $32,000, payable in installments, and represented by eight promissory notes, secured by deed of trust on the whole of said thirty-stamp mill, and the property of said company: now, therefore, in consideration of the premises and such novation, and the sum of one dollar, paid by said parties each to the other, it is mutually understood and agreed that, by the agreements hereinbefore set forth, the said contract between the said Chaffee and the said Bowen and Tankersley, dated January 3, A. D. 1876, is fully complied with and satisfied, and each of the parties thereto are hereby fully released in the premises.

"In witness whereof, we hereto set our hands and seals this day of ———, A. D. 1876.                          J. B. Chaffee.     [Seal.]
                              "————————.     [Seal.]
                              "————————."     [Seal.]

—And to the bill of sale signed by Bowen and Tankersley, and written on the back of the receipt given by Chaffee in January, of the stock as collateral, which bill of sale reads as follows:

"We have sold the whole of the stock mentioned in this receipt to Jerome B. Chaffee in payment for the 30-stamp mill.

[Signed]                                  "THOMAS M. BOWEN.
"*August* 16, 1876.                       CHAS. W. TANKERSLEY."

It is not, so far as the controversy between complainant and Bowen is concerned, very material whether, as an independent fact, Tankersley was party to this arrangement or not. The significance of the testimony in respect thereto is this: The complete overthrow of Tankersley's testimony, coupled with the obvious fact that, though nominally a defendant, he is really the suggester and promoter of this suit, casts large discredit on his entire testimony. In whatever of wrong was done to complainant and Binckley he was equally guilty with Bowen, and his apparent disclosures do not spring from any honest desire to make atonement therefor, but from unworthy motives as against Bowen. Under such circumstances a court may well be excused for placing little reliance upon his testimony.

(6) In pursuance of this arrangement, on the sixth of July, 1876, a meeting of the directors of the company was held, the complainant being present, and a resolution passed directing the issue of $32,000 in notes, and the execution of a deed of trust upon the property of the company as security therefor. And on August 16th a meeting of the stockholders was also held, at which complainant was also present, and at which three resolutions were passed, the complainant voting for all of them; the first authorizing the notes and deed of trust as above, and the third reading as follows:

"Resolved, *third,* that the thirty-stamp mill complete, including crusher, transferred to this company by Jerome B. Chaffee, includes the ten-stamp mill agreed to be erected by Charles W. Tankersley; and the said Tankersley is hereby fully receipted, and a full compliance with said contract on his part is hereby acknowledged; and that the $32,000 of notes executed and delivered to Jerome B. Chaffee shall be deemed and held full payment for the other twenty stamps, power, and machinery for running twenty stamps of same included in said thirty-stamp mill, the purchase whereof is hereby expressly authorized, ratified, approved, and confirmed."

Thereafter the notes and deed of trust were executed; Chaffee received $20,000; Tankersley, $12,000; $6,000 of the latter Tankersley gave to Bowen, and with this and a note of his own of $4,600, the latter purchased the $500,000 of stock from Chaffee. The stock thus passed into Bowen's hands, and was afterwards sold by him. The complainant, having bought out Binckley, now claims that of this stock $375,000 was theirs when pledged, in the first instance, to Chaffee; that no change in that respect was made with their knowledge or assent, and that Bowen, buying from Chaffee, simply bought from a pledgee with notice of the pledge; and the $32,000 of notes secured by this pledgee having been paid by the company, they are reinvested

with full title; and that he must respond to them for the value of this stock of theirs which he has converted.

Obviously the pivotal question now is as to their knowledge of and assent to the arrangement above named, or at least so much thereof as surrendered their stock in consideration of what was received by the company. And this question is very doubtful. I have had little trouble in tracing the course of events up to this point, but upon this I am much at a loss to determine the real truth. Both Binckley and the complainant testified that they knew nothing of any such arrangement; that they were informed of the contract of January 3d, and that the stock had been put up as collateral; and never knew of any change. Bowen, on the contrary, testifies that they were both informed of the change, and assented to it. He does not claim that they were told of the manner in which the stock and notes were divided between Chaffee, Tankersley, and himself; that, he testifies, he considered a private matter between the three, in which they had no interest, but that they were fully informed that 10 stamps of the Chaffee mill were to be taken by the company as a full performance by Tankersley of his contract, and, of course, if his contract was performed, he was entitled to retain the stock.

When there is such a direct contradiction in the testimony of the parties interested, we must look at their conduct and the surrounding circumstances to ascertain the truth. These matters, I think, plainly tend to sustain Bowen's testimony, and, while I may not notice all, I will mention some that have forcibly impressed me. And *first*, it must be borne in mind that the arrangement was in fact made as stated; the third resolution passed at the stockholders' meeting, and for which complainant voted. They had agreed to give and had given this stock to Tankersley upon his agreement to put up a 10-stamp mill. Of course, when he performed this contract, even if the stock was put in his hands simply in trust, as complainant and Binckley claim, the stock became his absolutely. Their title to the stock, their right to its return, their interest in it, was then wholly gone. And in this condition complainant votes for a resolution which, after referring to the 10-stamp mill contract, reads that "Tankersley is hereby fully receipted and a full compliance with said contract on his part is hereby acknowledged." How any person of ordinary intelligence could have assented to such a resolution, and still supposed that that contract was to be considered as unperformed and set one side, and the original owners of the stock reinvested with title thereto, is difficult of comprehension. Grant that it might have been fuller and more specific, might have stated that the original donors of the stock surrendered the same and all their claims thereto to Tankersley,—and still the import would have been the same, and the meaning but little more obvious. Full compliance with the contract is, in terms, admitted. Full compliance divested them of all claims to the stock; and yet now they say that they supposed all the time that the stock was theirs.

Again, they knew that Tankersley must have been to some expense by reason of his trip to Chicago. Whether they knew all the expense to which he had gone, is uncertain. But they nowhere pretend to have reimbursed or offered to reimburse him these expenses. Can it be that they supposed Tankersley was so generous as to donate these expenses? It is true that in January, 1877, a year after the Chicago trip, the company allowed Tankersley a few hundred dollars for money advanced by him, above the $6,000 in notes heretofore referred to, and it is possible that this allowance was for these expenses, but the testimony fails to show that it was. Again, if this stock was still theirs, why should they, owning less than half the stock in the company, advance three-fourths of the pledge. And when, as they soon did, they parted with substantially all the rest of the stock owned by them, why did not they insist that Tankersley, who had put up nothing in this pledge, should put up $125,000, and thus release to them for disposal a like amount? Still again, a very natural inquiry which suggests itself, and it would seem must have occurred to complainant, is, of what special advantage was the stock as collateral when a deed of trust on the entire property was held? The latter took all, while the former only covered a part. I do not mean that the stock did not have some special value in view of the ease with which it could be disposed of and its proceeds applied on the debt, but that was a value more easily appreciated by a shrewd and speculative business man than by one uneducated and ignorant; and an effort is made to picture the complainant and Binckley as of the latter class.

But further, and very strongly, the subsequent conduct of the complainant and Binckley indicates, to my mind, that they understood that they had given up this stock. Within a few months both left the San Juan country, having disposed of substantially all the other stock owned by them in the county; and from that time on until about the commencement of this suit, in 1883, they acted as though they had no interest in the company. They moved from place to place, never apparently concerning themselves with any of the affairs of the company, having no correspondence with its officers, and acting towards it as any stranger might be expected to act. Statements of complainant are testified to—some of which he denies, and some he attempts to explain—which emphasize his belief that he had no remaining interest in the company. When this conduct is placed along with the fact that in the fall of 1879 a rich deposit was discovered, and that in 1880 and 1881 over $300,000 was taken from the mine,—a fact not concealed, but notorious,—one is forced to the belief that they supposed they had no further interest in the mine, and that want of interest must have resulted from their having given up the stock in controversy, as defendant Bowen testifies, or from a belief that the pledgee had disposed of it to pay his claim. If the latter was the truth, it seems to me that, beyond question, inquiry would have been made. No man, especially no poor man, as each of the parties was, will remain silent

when a possibility of wealth belonging to him is suggested. In short, for I do not care to protract this opinion, I cannot reconcile voting for this resolution, and the subsequent indifference of the parties to the prospects and affairs of the company, with their present claim that they never knew nor assented to the giving up of this stock. It is not in accord with my convictions as to the probable conduct of ordinary men; and here I refer to what I said in the opening of this opinion, that, there being no confidential relation between Bowen and the complainant or Binckley, it devolves upon the complainant to prove that Bowen's conduct was wrongful, and not upon Bowen to prove that it was rightful. Doubts in the matter are to be resolved against the complainant. One thing more I should mention; I have spoken of complainant and Binckley as though they occupied the same position as developed in the testimony. This is not strictly true. Complainant was present at the directors' and stockholders' meeting; Binckley was not. The former's relations to the actual management of the affairs of the company seems to have been more intimate than the latter's. And still, if I may so define it, it seems to me that Bowen and Tankersley occupied one relation to the company and these transactions, while complainant and Binckley occupied another and partially antagonistic; and, further, that the relations between the two latter seem to have been such that it is only fair to presume that what one knew and assented to the other did also. Hence I have not distinguished between them, but have spoken of them as agreeing in knowledge and action. I do not know that I can add anything more to express my conclusions, or the reasons therefor, unless I were to go into the mere details of the testimony, and that would be a protracted and useless labor. My conclusion therefore is that the wrong charged upon the defendant Bowen is not proved. Of course, in the view I have taken, the matter of amendment to the answer is immaterial.

A decree will be entered dismissing the bill.