## WALSH *v.* GOULDEN.

1. DIRECTORS OF CORPORATION—AGENCY IN SALE OF STOCK—MIS-
.REPRESENTATION.

   Defendants, who were directors in a gaslight company, secured
   an option from all the stockholders to purchase their stock
   at double its par value. At the same time they held an option
   with another company to sell the entire stock and property
   of the gaslight company for the same price, of which agree-
   ment complainant was aware when he disposed of his stock
   to defendants. Subsequently defendants sold all the stock
   and property of the company to a new company for double
   its par value and an additional sum to pay the debts. After
   complainant gave the option, and after the making of the
   agreement to sell to the new company, but before such sale
   was completed, the new concern agreed to give each of the
   defendants $5,000 in bonds and $1,200 in stock of the new
   company if they would become directors thereof. *Held*, that
   defendants, not having made any false representations or
   secret agreement by which they were to profit at the expense
   of the stockholders, were not liable to complainant for any
   portion of the stock and bonds thus received.

2. FRAUD—EVIDENCE.

   He who charges fraud is bound to prove it by substantial evi-
   dence.

3. PRINCIPAL AND AGENT—DEALINGS BETWEEN.

   An agent may purchase of his principal, so long as he acts in
   good faith, and his principal is informed of the situation.

4. FIDUCIARY RELATION OF DIRECTORS TO CORPORATION—FRAUD.

   Directors of a corporation stand in a fiduciary relation to the
   corporation itself, but not to the stockholders when dealing
   with them for the purchase or sale of stock; and some actual
   misrepresentation is necessary to constitute fraud.

Appeal from St. Clair; Tucker, J., presiding. Sub-
mitted January 30, 1902. (Docket No. 50.) Decided
May 19, 1902.

Bill by Robert Walsh against James Goulden, Albert
D. Bennett, and Junius E. Beal for an accounting on the

sale of certain corporate property and stock. From a decree dismissing the bill, complainant appeals. Affirmed.

Complainant was a stockholder in the Port Huron Gaslight Company. The defendants were stockholders and directors. The capital stock was $40,000, in shares of $50 each. A rival company had existed for some time in the city, and both companies had been making little or no profits for some time. Efforts had been made to consolidate, and thus prevent a disastrous rate war, and place the companies upon a reasonably paying basis. They did not succeed. In 1897 efforts were made to dispose of both properties to a new company, and an option was given by the stockholders to sell out at $84 per share. This project failed. Subsequently the defendants and officers of the rival company opened negotiations with certain parties for a sale of the properties. The defendants carried on these negotiations, and the result was the execution of an agreement with each stockholder. They were all alike. The one made by the complainant reads as follows:

"Articles of agreement, made and entered into this 18th day of November, 1897, by and between Junius E. Beal, a resident of the city of Ann Arbor, in the county of Washtenaw and State of Michigan, party of the first part, and Robert Walsh, a resident of the city of Port Huron, party of the second part, witnesseth, that

" *Whereas*, the said party of the second part is the owner of 105 shares of stock in the corporation known and designated as the Port Huron Gaslight Company, a corporation organized and existing under and by virtue of the laws of this State; and

" *Whereas*, the said party of the first part is desirous of purchasing the right to purchase said shares of stock at any time within ninety days from the date of this contract, at and for the price of two dollars for every dollar's worth of stock so held by the said party of the second part as aforesaid:

"Now, therefore, for and in consideration of the sum of five dollars, to him in hand paid by the said party of the first part to the said party of the second part at the time of the ensealing and delivery of these presents, the receipt where-

of is hereby confessed and acknowledged, it is hereby stip-
ulated and agreed by and between said parties to this con-
tract that the said party of the second part, for and in
consideration of the sum of two dollars for every one dol-
lar of stock so held and owned by him in said corporation
aforesaid, hereby agrees to sell, assign, and deliver the
same to said party of the first part at any time within
ninety days after the date of this contract."

For a further statement, we adopt the following from
the finding of the circuit judge:

"At or about the time of procuring the options from the
stockholders to Beal, the three defendants gave to Lynn
and Baxter what purported to be an option to purchase
the entire plant of the Port Huron Gaslight Company at
$80,000; the concern to be taken subject to all its outstand-
ing liabilities. Just previous to the expiration of this
option, Lynn and Baxter paid $500 to defendants for an
extension of it. That $500 was paid into the treasury of
the company, and divided among the stockholders.

"In the spring of 1898, arrangements between the de-
fendants, Goulden, Bennett, and Beal, for a sale of the
company to Lynn and Baxter, of Detroit, seem to have
been perfected; and Mr. Bennett and Mr. Beal secured
from the several stockholders (the complainant among
others) their stock in the company, assigned in blank.
This stock was all obtained within a few days prior to
March 27, 1898, and was taken to Detroit by Bennett, to
be turned over to the new concern. At the time the
stockholders delivered their stock assigned in blank,
receipts were given to each of them, except complainant,
in the following form: 'Received from —— —— shares
of the Port Huron Gaslight Company stock, for which I
agree to pay —— dollars on or before April 1st, 1898;'
the number of shares in each receipt being filled in accord-
ing to the number of shares held by the party signing the
receipt, and also the amount of each receipt corresponding
to two dollars for every dollar, par value, of the stock so
receipted for. The receipts given to the Port Huron stock-
holders were all signed by A. D. Bennett personally, and
receipts given to the Ann Arbor stockholders were all
signed by Beal personally. Complainant insisted upon
his stock being paid for before it was delivered to Bennett;
and Bennett, on the date of the delivery to him of the

stock by complainant, paid for the same in full, at $100 per share, in accordance with the terms of the option. * * *

" The arrangements for a sale of the company to Lynn and Baxter provided that $80,000 was to be paid by them for the stock and assets of the company, and that they were to take care of its liabilities. They declined to take the assets and liabilities as they existed, and settle for themselves, and insisted that the defendants should provide for the same for a specified sum to be agreed upon, and the sum of $16,000 in cash was paid to the defendants by the new company for the purpose of taking care of its outstanding indebtedness. They were also to have and use for that purpose whatever might be collected or gotten from the outstanding accounts due the Port Huron Gaslight Company and its plumbing department. The total outstanding indebtedness of the concern amounted to, approximately, $19,000. The defendants gave a bond to take care of all liabilities of the concern. * * * The $16,000 in cash received, and the proceeds of the outstanding accounts due the concern, were insufficient to take care of those outstanding liabilities; and there can be no liability on the part of the defendants, or either of them, on account of any moneys received by them with which to care for the liabilities of the concern.

" The first arrangement of the defendants for a deal with Lynn and Baxter had fallen through; and about 10 days prior to the consummation of the final deal, which was on March 27, 1898, the gentlemen interested in the formation of the company concluded that it would be essential to the success of the new concern that some of the old stockholders resident in Port Huron should remain or become members of the new company, the franchise of which required a majority of the directors of the company to be residents of Port Huron, and as a consideration for the defendants remaining in the new company, and giving it the benefit of their experience, business standing in Port Huron, etc., offered them bonds in the new company in the sum of $5,000 each and $1,200 in stock. This proposition was, after some demur, accepted, so that each of the defendants received from the new company $1,200 of stock, face value, and $5,000 in bonds. This stock and these bonds received by the defendants were no part of the consideration for the sale of the plant, and the sole consideration therefor was the agreement on the part of

the defendants to continue their connection with the new company.

"The said defendants received the $80,000 provided to be paid by Lynn and Baxter for the total stock of the Port Huron Gaslight Company, out of which they paid to the several stockholders the amounts called for by their options,— $100 per share for the stock held by each. They also paid all the outstanding liabilities and bonded indebtedness of the company.

"There is nothing to indicate any fraud, breach of trust, or unfair dealing by the defendants, or either of them, with the complainant or any other stockholder of said concern, or with the company which they represented."

The case was heard upon pleadings and proofs taken in open court. Decree was entered for the defendants.

*Avery Bros. & Walsh*, for complainant.

*Phillips & Jenks* and *A. J. Sawyer & Son*, for defendants.

GRANT, J. (*after stating the facts*). The learned counsel for complainant state the theory of their case as follows:

1. Defendants secured complainant's stock, and all the other stock, by fraud in misrepresenting material facts, and in concealing the secret agreement.

2. Defendants acted as trustees of the complainant and other stockholders, *i. e.*, a fiduciary relation existed between them; and, when such relation exists, the trustee cannot retain a secret profit from the execution of the trust.

3. Defendants, being directors, could not profit by the sale, when such sale was brought about or influenced by their official action.

4. A trustee or agent cannot make a secret profit for himself as a result of his agency or trusteeship.

5. The agent cannot be a purchaser.

The principles of law stated in the above propositions are not disputed. Although the sale of the stock was a very advantageous one for the stockholders, yet, if the

defendants were the mere conduits through which these stockholders were to transfer their stock to Lynn and Baxter, and there had existed a secret agreement between them and defendants that the former were to pay the latter a consideration for procuring the sale of the stock, they would undoubtedly not be permitted to profit by such a transaction. The question, therefore, has become one entirely of fact; and the two questions are, Did the defendants make false representations as to material facts ? and, Was there a secret agreement by which they were to profit at the expense of other stockholders ? We find no evidence whatever of any misrepresentation of facts, material or immaterial. The stockholders were fully informed as to the situation. They knew the condition of their own company, had met and voted to dispose of the property at $2 for $1 for their stock, and had, by the agreement of November 18th, either made Mr. Beal their agent to carry out the sale, or had modified their resolution of sale by agreeing to sell their stock to him at the same rate. The defendants possessed no information which complainant and the other stockholders did not also possess. If Lynn and Baxter had failed to take the property, it is difficult to see what legal objection the stockholders could make to transferring their stock to Mr. Beal upon payment under their contract with him, regardless of the parties to whom he was to convey. All prior oral and written negotiations and agreements were merged in this written contract. It did not mention any other vendee than Mr. Beal. Had the complainant desired to limit the right to sell to Lynn and Baxter, and to make Beal his agent to effect the transfer, appropriate language should have been used for that purpose. What possible difference did it make to complainant to whom Mr. Beal sold, provided he got the price agreed upon ? Assuming, however, that the defendants stood in the position of agents to carry out the wishes of the stockholders, the question remains, Was there an agreement, at the time the sale was agreed upon, by which Lynn and Baxter, or the corporation to be formed

by them, were to give the defendants bonds and stock in the new corporation? There is no testimony whatever to even indicate that such an arrangement existed or was contemplated, either at the time of the execution of the contract to sell or the extension of that contract. There is no testimony that any such arrangement was even thought of, much less spoken of, until after the arrangements were made for the transfer of the stock, and about 10 days before it was actually transferred to the new corporation. He who charges fraud is bound to prove it, and that by substantial evidence. In order to sustain a decree against defendants, it must be found that they deliberately testified falsely, or else that the transaction is a fraud in law, no matter when the stock and bonds were given to them, or what the consideration, if any, was. Their testimony stands uncontradicted by any witness or any circumstances. The circumstances under which the bonds and stock were given to defendants are thus stated by Mr. Beal:

"Mr. Lynn, within a week or 10 days of the final closing of the sale, met me, and said:

"'We want you to stay in the company, sure, and I have got these bonds to sell. I want you to sell some of the bonds in Ann Arbor for us; and then I have got some other projects, too,—other gas companies,—I want you to be interested with me. You can control capital of your own and others in Ann Arbor, and I want to go in with you. I want to have you go in with this company.'

"And I have heard Mr. Goulden and Mr. Bennett, several times (and had agreed with them, too), express their determination when they sold the stock to get right out. They didn't want anything more to do with it. We saw there was a big storm coming here when the price of gas was raised, and a fight before the council, probably, for a charter, so that they just wanted to get out. They had expressed themselves that way.

"*Q.* In your presence?

"*A.* In my presence several times, and I had agreed with them.

"*Q.* Agreed with whom?

"*A.* With Mr. Bennett and Mr. Goulden.

" *Q.* That you would get out?

"*A.* Yes; that we would close right out. And then Mr. Lynn came to me and said that Goulden and Bennett would stay in if I would; if I would stay in, why, they would give us five thousand of the bonds apiece. They had, of course, a lot more bonds—Mr. Lynn—than was actually paid for the plants, and those bonds were theirs; and they were very anxious to sell the bonds, and were selling them at a discount, at times, and also with a stock bonus of 25 per cent. Anybody that would take $1,000 of bonds would have $250 of stock.

" *Q.* The stock bonus went with the bonds?

"*A.* Yes; that went with the bonds. And Mr. Lynn said:

"'Mr. Goulden and Mr. Bennett will stay in if you do, and I want to have you. We need you three. You understand the business up there, and have a knowledge of the situation; and, in this fight that is going to come on us, we want your hearty support and help and assistance, and, if you will do that, we will give you the bonds and the accompanying stock.'

" *Q.* He would give you how much of the bonds?

" *A.* Five thousand of bonds and 25 per cent. of stock.

*   *   *

" *Q.* After having this conversation with Lynn, did you then see Mr. Bennett and Mr. Goulden, to see whether or not they had agreed to accept this offer if you did? Did you talk that over with them?

"*A.* Yes.

" *Q.* Before you finally consummated it?

" *A.* Yes.

" *Q.* Now, let me see if I understand you. The contract was finally closed that day?

"*A.* Yes.

" *Q.* Did that five thousand that was paid you, or paid to either of these men, have anything to do with the price of the plant, according to the actual terms of your agreement?

" *A.* Nothing whatever. That had been settled long before."

Mr. Bennett's version of the transaction is the same. This is all the evidence on the subject.

Under this record, complainant received every cent he contracted for. He was not deceived. The terms of the

sale had been agreed upon, and a contract made, not only between the complainant, the other stockholders, and Mr. Beal, but also between Mr. Beal and Lynn and Baxter, by which he agreed to transfer the stock to them upon the payment of $80,000. When about to execute the papers to carry out the contract between Beal and Lynn and Baxter, they wanted defendants to remain as stockholders in the new corporation, and defendants Bennett and Goulden as directors. They at first strenuously objected, and for reasons which to them seemed good. They were finally persuaded to enter the new company,—all as stockholders, and the two as directors,—upon receipt of $5,000 of bonds, and the bonus stock which accompanied the same. There was nothing bad, in morals or in law, about this transaction. Lynn and Baxter owned the stock and bonds, and had the legal right to give it away or to sell it upon any consideration they chose. The defendants had the moral as well as legal right to purchase the bonds and to become stockholders upon any terms they chose to make with those who had the stock and bonds to sell. Their full duty to the stockholders of the old company was performed. We agree with the circuit judge that there is nothing in the transaction which indicates fraud, or reflects upon the honor and integrity of the defendants.

Counsel's statement that an agent cannot be a purchaser states the rule too broadly. An agent may purchase from his principal, so long as he acts in good faith, and his principal is informed of the situation. If the defendants or Mr. Beal had at one time been the agents for complainant to sell his stock, and afterwards complainant made a contract, with full knowledge of all the facts, to sell his stock to Mr. Beal, that contract would be binding. Directors, of course, stand in a fiduciary relation to the corporation itself. They do not stand in that relation, however, when dealing with other stockholders for the purchase or sale of stock. In the purchase and sale of stock between stockholders there must be some actual misrepresentation in order to constitute fraud. Mere silence is not sufficient.

The books of the corporation are open to all stockholders alike, and each may inform himself of the condition of the company. 1 Cook, Corp. § 320; *Rose* v. *Barclay*, 191 Pa. St. 594 (43 Atl. 385, 45 L. R. A. 392); *Carpenter* v. *Danforth*, 52 Barb. 581; *Grant* v. *Attrill*, 11 Fed. 469. Other cases of the like import are cited in the defendants' brief.[1]

Decree is affirmed, with costs.

HOOKER, C. J., MOORE and MONTGOMERY, JJ., concurred. LONG, J., did not sit.

---

[1] Viz.: *Tippecanoe Co. Com'rs* v. *Reynolds*, 44 Ind. 509 (15 Am. Rep. 245); *Deaderick* v. *Wilson*, 8 Baxt. 108; *Alexander* v. *Rollins*, 84 Mo. 657; *Crowell* v. *Jackson*, 53 N. J. Law, 656 (23 Atl. 426); *Gillett* v. *Bowen*, 23 Fed. 625; *Smith* v. *Hurd*, 12 Metc. (Mass.) 371 (46 Am. Dec. 690); *Spering's Appeal*, 71 Pa. St. 11 (10 Am. Rep. 684); *Allen* v. *Curtis*, 26 Conn. 456; *Bloom* v. *Loan Co.*, 152 N. Y. 114 (46 N. E. 166).