E. J. DAWSON, Appellant, v. NATIONAL LIFE INSURANCE COMPANY OF AMERICA et al., Appellees.

**CORPORATIONS:** Officers—Fiduciary Relation to Stockholders—Purchase of Shares—Presumption—Burden of Proof. A fiduciary relation exists between a managing officer of a corporation and a stockholder *with relation to the stockholder's shares of stock,* and any contract between them by which such officer acquires profit out of such shares to the detriment of such stockholder is presumptively fraudulent and voidable, and the burden is on such officer to rebut such presumption by an affirmative showing that said contract was fairly procured for value, or, if obtained for less than value, that it was procured upon full disclosure of all facts bearing on value known to such officer and unknown to the stockholder.

PRINCIPLE APPLIED: Plaintiff was bookkeeper, and owned 3 shares of the stock of the Des Moines Life Ins. Co. Of the 1,000 shares of stock outstanding, Rawson, the president, owned 251 shares; Mrs. Rawson, the vice-president, 250 shares; a son, 1 share; and Harbach, the secretary (and Rawson's son-in-law), 50 shares. The other 448 shares (which included plaintiff's shares) were widely scattered. There was evidence justifying the jury in finding that the value of the shares was much in excess of $200 each, especially if sold for the purpose of effecting reinsurance. The active management of the company was by Mrs. Rawson and Harbach, owing to the president's illness. The National Life Ins. Co., through its president, Johnson, conceived the plan of acquiring all the assets of the Des Moines Company by acquiring its stock and reinsuring its risks in the National. Johnson was willing to put in $700,000 to effect the deal, and the jury could have found that the Rawsons and Harbach so knew. Protracted negotiations resulted in an agreement to buy the Rawson stock, 502 shares, for $500,000—practically $1,000 per share—and Harbach's 50 shares for $10,000,—$200 per share, *apparently;* but all this was on condition that Johnson could get the remaining 448 shares, or practically all of them, for not to exceed $200 per share. Mr. and Mrs. Rawson, Harbach and Johnson then, by concerted plan, ar-

ranged that Johnson, through Harbach's agency, should secretly acquire the said 448 shares. For this latter service, Harbach was to receive, and ultimately did receive, $40,000, in addition to $10,000 for his 50 shares, and was put on the pay roll of the National Company for three years at $12,000 per annum. Harbach did secretly buy, for Johnson, all but 14 of the 448 shares, for something less than $200 per share, plaintiff being induced to sell his 3 shares for the latter figure per share. *The foregoing negotiations and the scheme involved therein were not revealed to plaintiff.* The deal was worked out, the Rawson-Harbach family receiving $550,000 for 552 shares, out of the $700,000, while the remaining 448 shares received less than $99,600, the remaining $50,000, plus, going for "other expenses" in perpetrating the deal. *Held*, plaintiff, in his action for damages for fraudulent purchase of his stock, was entitled to recover of those participating in the scheme the value of his stock without reference to the price agreed on at the time of the sale, and that the jury should have been instructed in accordance with the principle stated in the syllabus.

*Appeal from Polk District Court.*—W. S. AYRES, Judge.

MONDAY, MAY 15, 1916.

ACTION to recover damages consequent upon fraud alleged to have been practiced in the purchase of three shares of stock in the Des Moines Life Insurance Company. From judgment entered on the verdict, plaintiff appeals.—*Reversed.*

*Casper Schenk*, for appellant.

*Maurice E. Locke, Cummins, Hume & Bradshaw*, and *J. B. Weaver, Jr.*, for appellees.

LADD, J.—The Des Moines Life Insurance Company was organized on the mutual plan about 1885, and so continued under various forms of organization until about January 1,

CORPORATIONS: officers: fiduciary relation to stockholders: purchase of shares: presumption: burden of proof.

1908, when it was incorporated under the laws of Iowa as a legal reserve life insurance company, with a capital stock of $100,000 divided into 1,000 shares of the par value of $100 each. Its business expanded so that, in the fall of 1911, nearly $30,000,000 of insur-

ance was in force. The health of its president, C. E. Rawson, failed, and the burden of managing the company devolved largely on his wife, L. C. Rawson, and son-in-law, Wilmot A. Harbach, who had been vice-president and secretary respectively since the reorganization. Rawson owned 251 shares of stock; Mrs. Rawson, 250 shares; their son Homer, 1 share; and Harbach, 50 shares. The remaining 448 shares were widely distributed; for in reorganizing, any policy holder was permitted to subscribe for a limited number, and in that way, plaintiff, who was the company's chief bookkeeper, acquired 3 shares. The book value of these shares was about $130 each at the time in question, but shares had been sold for as much as $150 each. A surplus of $350,000 not assigned to policy holders had accumulated, and, according to the evidence, the value of the insurance outstanding for the purpose of transferring to another company was about $15 per $1,000 of stipulated indemnities, or altogether, about $450,000. This, of course, included the transfer of agencies, in so far as possible, and other incidental advantages. Manifestly, the management had been efficient, and there was room for a finding that the actual value of the stock was much more than either the book value or prices at which previously sold, or $200 per share paid plaintiff by defendant Harbach on December 8, 1911, especially if disposed of for the purpose of effecting reinsurance. During the time in question, the National Life Insurance Company of the United States was a corporation organized under the laws of Illinois, with a capital of $500,000, divided into shares of $100 each, of which Albert M. Johnson owned 3,420; his wife, 1,050; Robert D. Lay, 500; and Robert E. Sackett, 30. Johnson was president, and Lay, secretary, both being directors. Since January 23, 1912, W. A. Harbach has been in the employ of that company in the agency department, at a salary of $12,000 per annum. For more than a year, Johnson had been negotiating in behalf of his company, either directly with Mrs. Rawson or, through Harbach, with Mr. and Mrs. Rawson, for the purchase of the stock of

the Des Moines company, with the well-understood purpose of reinsuring its risks in the National Life Insurance Company and taking over its assets. These negotiations culminated in an option, November 29, 1911, in the words following:

"For and in consideration of one dollar and other good and valuable considerations in hand paid.to C. E. Rawson and L. C. Rawson by A. M. Johnson, receipt of which is hereby acknowledged, the said C. E. Rawson and L. C. Rawson hereby agree to sell and the said A. M. Johnson hereby agrees to buy on or before February 28, 1912, 502 shares of the capital stock of the Des Moines Life Insurance Company for the sum of $500,000, to be paid as mutually agreed to.

"If either party fails to perform their part to this agreement they shall pay to the other the sum of $5,000 as liquidated damages.

"In witness whereof the parties hereto have set their hands and seals this 29th day of November, A. D. 1911.

"C. E. Rawson    (Seal)
"L. C. Rawson    (Seal)
"A. M. Johnson   (Seal)"

At the time this was signed, the parties thereto, with Harbach, arranged that Johnson should acquire the remainder of the stock, or substantially all of it, at not to exceed $200 per share, and that Harbach should purchase the stock for Johnson. On December 1st following, the latter addressed a letter to Harbach, saying that his 50 shares of stock would be purchased for the sum of $10,000, to be paid when the shares of Mr. and Mrs. Rawson were finally acquired, and on the following day placed in Harbach's hands $80,000 out of which to obtain the remaining 448 shares of stock. Harbach acknowledged this and outlined a plan under which the name of the purchaser would be concealed. On December 16th, Harbach was paid for his stock, and on the 23d, Johnson advised Harbach:

"That, upon the consolidation or reinsurance of the Des Moines Life Insurance Company by the National Life Insurance Company of the United States of America, you will be placed upon the pay roll of the National Life Insurance Company of the United States of America for a term of three years, at a salary of $12,000 per year, payable monthly.

"For your services in assisting me in purchasing the capital stock of the Des Moines Life Insurance Company, and for other services in connection with the possible consolidation or reinsurance of the Des Moines Life Insurance Company by the National Life Insurance Company of the United States of America, you are to receive the sum of $40,000, upon terms of payment to be agreed upon between us, at the same time the stock of C. E. and L. C. Rawson is purchased and paid for."

This latter would make the price of Harbach's stock a little higher than that to be paid the Rawsons. The plan doubtless was adopted because of Harbach's agency in buying the minority of shares. He had bought for Johnson all but 14 of these shares at an average price of something less than $200 per share. On January 23, 1912, the Des Moines Life Insurance Company and the National Life Insurance Company entered into a contract, by the terms of which the former undertook to transfer to the latter all of its assets and business; and the National Life Insurance Company, in consideration thereof, agreed to save the Des Moines Life Insurance Company harmless, to assume all its obligations on outstanding policies, to maintain the necessary legal reserves, make necessary reports, and to enter into direct individual supplementary contracts to this effect with the policy holders of the Des Moines Life Insurance Company, and further, to "pay the Des Moines Life Insurance Company $700,000—$300,000 on the taking effect of the agreement, and $400,000 in five annual installments of $80,000 each." This plan was approved by the state reinsurance commission, consisting of the governor, auditor of state and attorney general. The contract was performed, and thereafter the Rawsons were

paid $500,000 in money or legal obligations to pay for their 502 shares of stock, or nearly $1,000 per share, and Harbach, $40,000 for his services rendered Johnson in consummating the deal; and also he was taken into the employment of the National Life Insurance Company at the salary agreed upon, more than double that paid him by the Des Moines Life Insurance Company. The evidence was such that the jury might have found that, though the president of the Des Moines Life Insurance Company was enjoying a salary of $10,000 per year, the vice-president, a salary of $6,000, and the secretary, a salary of $5,000, they had negotiated, for nearly a year, without the knowledge of other stockholders, with Johnson as president of the National Life Insurance Company with the distinct purpose of effecting, directly or indirectly, the transfer to his company of all the assets and risks of the Des Moines Life Insurance Company, and thereby terminating its existence. Until Johnson, in pursuance of the plan agreed upon, had acquired substantially all the shares of the minority stockholders, he humored Mrs. Rawson's sentiment against participating in the actual transfer of the assets and reinsuring the risks; but thereafter he insisted that this be done as a condition precedent to buying the Rawsons' stock, and she finally acquiesced, and the deal as contemplated from the outset was consummated. According to Johnson's testimony, the completion of the deal depended upon obtaining substantially all the shares of the minority stockholders. The jury might well have found, but for the withdrawal of the issue, that the negotiations from the beginning were to acquire all the company's property; that the scheme of buying the stock was merely a means of accomplishing this; and that these directors and officers, knowing that Johnson was ready and willing to pay approximately $700,000 therefor, secretly connived with him to so effect the transfer that the Rawsons and Harbach might receive an unfair portion of the proceeds of the sale,— that is, $550,000 for their 552 shares of stock, or nearly $1,000 per share,—while those owning the 448 shares should have less

than $100,000, leaving the balance for the added expenses of perpetrating the deal in this fashion.

Appellant requested the court to instruct the jury in the language following:

"You are instructed that a director and managing officer of a corporation doing business as a life insurance company stands in a relation of a fiduciary to all the stockholders who are not themselves engaged in the active management of the company, and before any such director and officer of the company, who is acquainted with its conditions and affairs, can rightfully purchase the stock of such company from stockholders who are not actively engaged in the management and operation of the corporation, such managing officer and director must inform such stockholders of the true condition of the company and its affairs and assets, and must give to such stockholders all the information affecting the value of the stock which such officer himself possesses; and a purchase from a stockholder who is not acquainted with the condition and affairs of the company, of his stock in such company, by one of the directors and managing officers, without first having informed such stockholder of the true condition of the company, and value of its assets, is a fraud on the part of such officer and director, and renders him or her liable to pay the stockholders the full value of the stock without reference to the price agreed on at the time of the sale, provided the stockholder does not himself know the value of the stock."

This was refused and the jury told that:

"Neither the defendant W. A. Harbach nor the defendant L. C. Rawson were bound, because of their official position with the Des Moines Life Insurance Company, . . . to make any disclosures as to the reinsurance or merger of said company."

And to this plaintiff excepted. That both had knowledge of facts materially affecting the value of the shares of its capital stock not possessed by other shareholders is not questioned, and whether the instruction was correct necessarily

depends on the nature of the relation sustained by the defendants named as directors and secretary and vice-president, to the shareholders as such. If the relation was fiduciary in character with respect to the interests of the shareholders represented by their shares of stock in the company, then they owed the duty, before assisting Johnson in purchasing, to disclose everything bearing on their value coming to their knowledge as officers of the company. If no such relation existed, then they might deal with them severally, precisely as a stranger to the organization might, even to the extent of intentionally helping others to buy their stock at a mere fraction of its actual value. The authorities are agreed that the officers and directors of a company are trustees of the stockholders in many respects, as in the transaction of the business and care of property of the corporation, but there is a conflict as to whether any fiduciary relation exists between them concerning the shares of capital stock. One line of cases, while recognizing that the directors and managing officers are trustees for the shareholders in some respects, limit these strictly to matters appertaining to the management of corporate affairs, and say that dealing with the individual shareholder concerning his shares of capital stock is not within the scope of the trust relation, and that, as director or officer, he is charged with no duty to the stockholder with reference to his shares; in other words, the matter of buying from or selling to the stockholder capital stock in the corporation is wholly without the scope of his agency as director or managing officer thereof. *Board of Commissioners of Tippecanoe County v. Reynolds,* 44 Ind. 509 (15 Am. R. 245); *Carpenter v. Danforth,* 52 Barb. (N. Y.) 581; *Deaderick v. Wilson,* 8 Baxt. (Tenn.) 108. Other decisions merely restate this conclusion and cite the above cases, especially the first two, as establishing it, and many textbooks do likewise. See *O'Neile v. Ternes,* 32 Wash. 528 (73 Pac. 692); *Haarstick v. Fox,* 9 Utah 110 (33 Pac. 251); *Crowell v. Jackson,* 53 N. J. L. 656 (23 Atl.

426); *Walsh v. Goulden,* 130 Mich. 531 (90 N. W. 406);
*Hooker v. Midland Steel Co.,* 215 Ill. 444 (106 Am. St. 170);
*Bawden v. Taylor,* 254 Ill. 464 (98 N. E. 941); *Grant v.
Attrill,* 11 Fed. 469; *Gillett v. Bowen,* 23 Fed. 625; *Haver-
land v. Lane* (Wash.), 154 Pac. 1118; 1 Cook on Corp. (7th
Ed.), § 320; 2 Machen on Corp., § 1637; Bower on Actionable
Non-Disclosure, §§ 138, 308; Cooley on Torts (3d Ed.) p.
991. In *Smith v. Hurd,* 12 Metc. (Mass.) 371 (46 Am. Dec.
690), Chief Justice Shaw, in holding that an individual stock-
holder might not maintain an action against the directors of
a corporation for damages consequent upon negligence and
malfeasance in what they did as such, resulting in loss and
waste of its capital, observed:

"There is no legal privity, relation or immediate connec-
tion between the holders of shares in a bank in their indi-
vidual capacity, on the one side, and the directors of the bank
on the other. The directors are not the bailees, the factors,
agents or trustees of such individual stockholders."

And it was decided that such an action might be main-
tained by the corporation only. On the principle thus stated,
the above decisions seem to be founded, as will best appear
from excerpts from the leading cases. In *Carpenter v. Dan-
forth,* supra, Sutherland, J., in the course of the opinion, said:

"There was certainly a trust relation between the plain-
tiff as the holder of, or as the person having the legal title to,
the shares of stock, and the defendant, Danforth, as a trustee
or director. A corporation aggregate can only act by agents.
Its trustees or directors are its agents for managing its affairs.
They are such agents, viewing the corporation either in the
abstract, as an immaterial thing, of legislative creation, with a
name and certain powers and rights given by law, or as com-
posed of its corporators, or shareholders, having the right to
share pro rata in its dividends. There is, therefore, a certain
trust relation between the shareholders and the directors of a
corporation; but the trust put in the directors usually extends,
and I must assume that in this case it extended only to the

management of the general affairs of the corporation, with a view to dividends of profits; and, therefore, that the trust relation between the plaintiff and the defendant Danforth extended no farther. The title to the property of a corporation is in neither the directors nor shareholders. It is in the corporation as an abstract, immaterial thing of legal creation. The directors are not trustees for the sale of the stock of the corporation. They have no power, *as directors*, to sell stock; they have no power to sell any stock but their own. The defendant Danforth was not a trustee for the sale of the plaintiff's stock. The plaintiff's *stock* was not the subject of trust between them, nor had the trust relation between them any connection with the plaintiff's stock, except so far as the good or bad management of the general affairs of a corporation by its directors, indirectly affects the value of its stock. In *Knight v. Majoribanks* (2 Mac. & G. 10), it was held, 'that the circumstance, that two parties stand towards each other in the relation of trustee and *cestui que trust*, does not affect any dealings between them, unconnected with the subject of the trust.' I think it will be found, in most of the cases referred to by the counsel, that it appeared, or that it was assumed, that the trust, or trust relation, extended to the subject of the dealing, or contract in question. . . . The counsel does not say, and he could not say, that the strict or technical relation of trustee and *cestui que trust* exists between the director and shareholder, for the legal title to the corporate property is not in the directors; but he insists that the trust relation which does exist between them, as to the management of the affairs of the corporation, compels the director, on a purchase of stock, to disclose all the facts within his knowledge, material on the question of value, not known to the seller—that this disclosure is a duty *arising from the trust relation,* independent of the question of positive or actual fraud; in other words, that the trust or trust relation, *for or as to the management,* subjects the director to the rule or principle of equity which has been so often referred to. I

think that the sale or transaction, or its subject, is not so far connected with, or the subject of the trust, or trust relation which is admitted to exist, as to subject the director to, or give the seller the benefit of, the principle of equity, or to make the principle reasonably applicable to the transaction. It will not do to make the principle generally applicable to purchases by directors of the stock of their corporations. As to stocks which have a regularly quoted price or market value, parties generally sell and buy them, with reference to *this* price or value, rather than with reference to their real value, or any opinion of their real value, founded on a knowledge or supposed knowledge of the condition of the corporations or of their affairs. As to such stock, would it do to make the purchase of it by a director, though it happened to be the stock of his own corporation, an exception, and to say that the parties dealt with reference to the real condition of the corporation and the supposed real value of the stock, founded on a knowledge or supposed knowledge of its affairs? Plainly it would not; and plainly in such case, the application of the principle of equity would be unreasonable. But the duty arising from the *mere trust relation* must be the same, in all cases where the same trust relation exists; for courts of equity, though they deal with special cases, apply general principles. My conclusion is, then, that this case is not a case of constructive fraud—that there was not any such trust or confidential relation between the plaintiff and Danforth as to make the principle of equity, which has been referred to, reasonably applicable to the case.''

In *Board of Commissioners v. Reynolds,* supra, the court, after the statement of facts, proceeded:

''Was the defendant, in consequence of being a director and the president of the company, a trustee of the plaintiff as a stockholder, whereby it became his duty, as a purchaser of the stock, to pay a fair and adequate price for it, to take no advantage of the relation which he bore to the company or the knowledge acquired thereby, and to disclose to the plain-

tiff all the material facts within his knowledge?  .  .  .  We are of opinion, upon an examination of such authorities as have been brought to our notice, upon the point, that the relation of trustee and *cestui que trust* does not exist in such case. It is said very frequently in the books that the directors of a corporations are trustees of the stockholders, and that the relation of trustee and *cestui que trust*, with its consequences, exists between them.   But these expressions must always be understood to have relation to the cases to which they are applied, and not to be of universal application.   It may be conceded that, in respect to the property of the corporation, whether it be land, money, securities, capital stock, or other property held by the corporation, and the management of its business, the directors are trustees for the stockholders.   The action of the directors in respect to the property of the corporation must affect, to a greater or less degree, the stockholders generally.   It has been generally in such cases, or where the action of the directors has affected the whole body of stockholders, that the relation of trustee and *cestui que trust* has been held to exist.  .  .  .  It seems to us, however, keeping in view the current of authorities, that notwithstanding the general language employed in the above cases, for some purposes, the directors of a corporation stand in a relation similar to that of trustees for the shareholders.   This seems to be the case in reference to the management, by the directors, of the property and general affairs of the corporation.   These are matters usually entrusted to the directors, and in respect to which they are empowered to act; and their action affects the whole body of shareholders, beneficially or injuriously, in respect to dividends upon, or the value of, their stock.   But stock in a corporation held by an individual is his own private property, which he may sell or dispose of as he sees proper, and over which neither the corporation nor its officers have any control.   It is the subject of daily commerce, and is bought and sold in market like any other marketable commodity.   The directors have no control or dominion over it whatever, or

duty to discharge in reference to its sale and transfer, unless it be to see that proper books and facilities are furnished for that purpose. As the property of the individual holder, he holds it as free from the dominion and control of the directors as he does his lands or other property. . . . Such being the nature of the interest of the stockholder in his stock, and the directors having no control, power, or dominion over it, or duty to discharge in reference to it, beyond the duty devolving upon them to prudently manage the affairs and property of the corporation itself, it seems to us to be very clear, that, in the purchase of stock by a director from the holder, the relation of trustee and *cestui que trust* does not exist between them.''

In several of the cases cited, the decision may be put on other grounds, but in each is to be found the approval of the ruling in cases from which we have quoted. The consequences were such that their correctness was immediately challenged. In *Board of Supervisors v. Reynolds*, supra, Downey, C. J., in dissenting, denounced the contract upheld by the majority ''as hard, unconscionable and fraudulent'' and was of opinion that an actual fraud had been perpetrated and that the president of the corporation ''occupied a relation of trust and confidence toward the county (owner of shares bought) which, under the circumstances disclosed, made him guilty of constructive fraud.'' As often declared, law is not alone the product of abstract reasoning, but of experience as well. It is the outcome of logic of the mind confirmed by the logic of events. The consequences of the application of a rule often furnish the most potent argument in its support or are most persuasive in its condemnation. Some of the cases disclose unconscionable advantages as the reward for the suppression of truth. Thus, in *Board of Commissioners of Tippecanoe v. Reynolds*, supra, the president of a railroad company bought 570 shares of its stock through agents for $25,650, when these were actually worth $342,000. In *Carpenter v. Danforth*, supra, a director of a company, under the guise of friendship

for the family, bought of the executor of a deceased stock-
holder shares at $60 each, on which a dividend of 310 per
cent. was declared within five months, and another of 200 per
cent., eight months later.   In other words, with the informa-
tion which he had acquired as officer of the corporation, and
which he knew the executor did not possess, he pocketed $195
a share, or $26,520, which in all fairness belonged to the estate
of his deceased friend.   The possibility of so dealing with
corporate stock has proven a strong temptation to dishonest
management of the business of corporations, and in instances
without number has enabled the managing officers to reap the
profits legitimately belonging to the shareholders.   The rule
has operated as a shield for those who obtain control of cor-
porate affairs, not to carry out the purposes of the organiza-
tion, but to profit from the manipulation of its affairs, enabling
them, by artificially increasing or depressing the market value
of its stock, to take advantage of the confidence of their unsus-
pecting associates.   There is something wrong in any rule
which will enable a director legally by his position to obtain
for himself alone profits all have won.

No stockholder would urge his choice as director that he
might have such an opportunity.   That a director or manag-
ing officer might thus serve his selfish purposes to the detri-
ment of stockholders would tend strongly to discourage stock
investments and be a menace to the efficient management of
the business of corporations.   The debate as to whether tech-
nically a fiduciary relation exists may and doubtless will go
on, but a knowledge of the law is not required to enable one
to appreciate the moral wrong perpetrated by a corporate offi-
cer in profiting by the ignorance of a stockholder by means
of knowledge acquired by virtue of his position.   That stock-
holders look to the managing officers for results, no one ques-
tions, and the natural tendency of stockholders is to rely on
being fairly and openly dealt with by such officers.   It is often
difficult to draw precisely the line separating intimate from
hostile relations.   Surely the test is not alone whether one is

trustee for the other.    The attorney is not ordinarily a trustee
for his client, nor the priest for his parishioner, nor the agent
for his principal, and yet the several relations are of the high-
est confidence, and impose the obligation of open dealing.
The very selection for service is an expression of confidence,
and the employment, the bestowal of power.    The shareholder
selects the director to serve him in caring for the corporate
property.    Upon his efficiency largely depends the value of
the investment in its capital stock.    Is he not thereby express-
ing his confidence?    Is his faith in the man chosen to manage
its affairs any less because of the corporation's being a separate
and independent entity?    The ordinary stockholder gives little
or no attention to the details or control of corporate affairs.
He trusts all with the managing officers, and naturally relies
on them in all matters touching his interest in its business and
property.    Stockholders, other than directors and officers,
stand on an equal footing and deal with each other at arm's
length.    No power with respect to the corporate property has
been conferred on one not possessed by the other.    But power
akin to that of an attorney, priest, agent or copartner is con-
ferred on the directors and officers by those selecting them to
manage corporate affairs.    Not that they have control of the
shares of the stockholders, but for that they do control nearly
everything affecting their value.    The fiduciary obligation is
to the stockholders in a body.    Why not to the component
parts represented by the shares?    The relative position is such
as to inspire confidence, and experience has frequently demon-
strated that it actually exists.    Why should the law say, then,
that it does not, for that one is not the trustee for the other,
when this is not a requisite in other relations?

The fiduciary relation may exist wherever special confi-
dence is reposed, whether the relationship be that of blood,
business, friendship or association, by one person in another
when they are in a position to have and exercise or do have
and exercise influence over each other.    *Curtis v. Armagast,*

158 Iowa 507.    The rule is well stated in *Cowee v. Cornell*, 75 N. Y. 91, 99:

"Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that, either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or, on the other, from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary, and well understood."

The officers of a corporation, by virtue of their position as trustees of the entire body of shareholders, acquire superior knowledge of the company's affairs bearing on the values of the shares of stock, and as a consequence thereof deal with a mere stockholder on unequal terms, in reference to said shares, and, owing to their superior knowledge and the natural reliance of the shareholders on their officers, are in a situation to exercise an influence that they could not otherwise exert. Though the stockholders have no legal title to the property, it being owned by the invisible intangible entity known as the corporation, their shares represent integral parts of the whole, the proportional shares of the dividend declared or to be declared, and of the net assets upon dissolution. Necessarily every detriment or disadvantage to the property or business affects proportionately the several shares of stock, for they represent parts of the entity. To say, then, that a director, as such, owes nothing to the shareholders, as such, is in effect declaring that, though acting as trustee of the entity, he is under no obligation with respect to its component parts. In his capacity as director, he served the entire body of stockholders, and in doing so he cannot well escape serving the individual

stockholder as well.  The stockholders elect him to represent them in managing the corporation's affairs.  This is because it is impracticable for them to administer such affairs directly. As a director for all, he serves each as well.  Surely, as a servant of all, he necessarily is incapacitated to oppose the stockholders severally.  Undoubtedly, he is not a trustee of the stockholder in the strict sense, for he does not have title to the latter's stock.  His relation is that often denominated quasi trustee.  Mr. Pomeroy, in his work on Equity Jurisprudence (3d Ed.), Vol. 3, § 1090, clearly analyzes the relation of the directors of a corporation with it and the stockholders:

"The trust character of directors is involved in the very organization of a corporation, and is necessarily twofold— towards the corporation, and towards the stockholders.  The doctrines are fundamental and familiar that the corporation itself is a legal personality, and holds the full title, legal and equitable, to all corporate property.  Stockholders, individually and separately, hold the full title, legal and equitable, to their respective shares of stock.  A stockholder does not, by virtue of his stock, acquire any estate, legal or equitable, in the corporate property; he obtains only a right to participate in the lawful dividends while the corporation is in being, and to his proportionate share of the net assets upon its dissolution and final settlement.  Shares of stock, however, are regarded by courts of law and of equity as a species of property, as vendible in the market, as having a pecuniary value, and as clothing their owner with proprietary rights which will be protected and enforced.  From this analysis it is obvious that, so far as the trust embraces or is concerned with the corporate property, the directors and managing officers occupy the position of quasi trustees towards the corporation only; there is no relation of beneficiary and trustee, having the corporate property for its subject-matter, between the stockholders and the directors.  The directors are also agents for the corporation, but that fact does not prevent them from

being in a partial sense trustees for the corporation.   The important conclusion I repeat, that this phase of their trust is concerned with and confined to the corporate property; from it arise their fiduciary duties towards the corporation in dealing with such property, and the equitable remedies of the corporation for a violation of those duties.   On the other hand, the directors and managing officers occupy the position of quasi trustees towards the stockholders alone, and not at all towards the corporation, with respect to their shares of stock. Since the stockholders own these shares, and since the value thereof and all their rights connected therewith are affected by the conduct of the directors, a trust relation plainly exists between the stockholders and the directors, which is concerned with and confined to the shares of stock held by the stockholders; from it arise the fiduciary duties of the directors towards the stockholders in dealings which may affect the equitable remedies for a violation of those duties.   To sum up, directors and managing officers, in addition to their functions as mere agents, occupy a double position of partial trust; they are quasi or *sub modo* trustees for the stockholders with respect to their shares of the stock.''

The subject is so fully discussed in *Oliver v. Oliver*, 118 Ga. 362 (45 S. E. 232), as to leave little to be added.   There the petitioners were owners of 658 shares of stock in an oil company, to purchase which at $110 each, defendant, who was president and director, obtained an option.   He was then negotiating a sale of the plant for $304,500, which would be $185 per share, but concealed this from the petitioners; and, as soon as the sale of the plant was agreed to, closed the option and completed the sale, realizing a profit of $49,250.   A demurrer to a complaint so alleging and praying to recover such amount because of constructive fraud in not disclosing the facts concerning the prospective sale to plaintiffs was over-ruled, and the court, speaking through the late Mr. Justice Lamar, said:

''The fact that he is trustee for all is not to be perverted

into holding that he is under no obligation to each. The fact that he must serve the company does not warrant him in becoming the active and successful opponent of an individual stockholder with reference to the latter's undivided interest in the very property committed to the director's care. That he is primarily trustee for the corporation is not intended to make the artificial entity a fetich to be worshipped in the sacrifice of those who in the last analysis are the real parties at interest. No process of reasoning and no amount of argument can destroy the fact that the director is, in a most important and legitimate sense, trustee for the stockholder. . . . Not a strict trustee, since he does not hold title to the shares, not even a strict trustee who is practically prohibited from dealing with his *cestui que trust,* but a quasi trustee as to the shareholder's interest in the shares. If the market or contract price of the stock should be different from the book value, he would be under no legal obligation to call special attention to that fact, for the stockholder is entitled to examine the books, and this source of information, at least theoretically, is equally accessible to both. It might be that the director was in possession of information which his duty to the company required him to keep secret; and, if so, he must not disclose the fact even to the shareholder, for his obligation to the company overrides that to an individual holder of the stock. But if the fact so known to the director cannot be published, it does not follow that he may use it to his own advantage, and to the disadvantage of one whom he also represents. The very fact that he cannot disclose prevents him from dealing with one who does not know, and to whom material information cannot be made known. If, however, the fact within the knowledge of the director is of a character calculated to affect the selling price, and can, without detriment to the interest of the company, be imparted to the shareholder, the director, before he buys, is bound to make a full disclosure. In a certain sense the information is a quasi asset of the company, and the shareholder is as much entitled to

the advantage of that sort of an asset as to any other regularly entered on the list of the company's holding. If the officer should purposely conceal from a stockholder information as to the existence of valuable property belonging to the company, and take advantage of this concealment, the sale would necessarily be set aside. The same result would logically follow where the fact giving value to the stock was of a character which could not formally be entered on the record. Where the director obtains the information giving added value to the stock by virtue of his official position, he holds the information in trust for the benefit of those who placed him where this knowledge was obtained, in the well-founded expectation that the same should be used first for the company, and ultimately for those who were the real owners of the company. The director cannot deal on this information to the prejudice of the artificial being which is called the corporation, nor, on any sound principle, can be permitted to act differently towards those who are not artificially but actually interested. . . . If, then, any sort of trustees, they are necessarily subject to the obligations and restrictions which inhere in that relation as to property intrusted to them. The shares are but the paper evidence of the interest which the stockholder has in the property under the control of the director. In their sale, the stockholder disposes not only of the lithographed or engraved scrip, but of his holdings in property. And when the director deals with a stockholder for the purchase of shares, he is not buying paper, but in effect is buying an undivided and substantial interest in property which has been committed to the director's care, custody, and control. Equity abhors mere names, and looks to the substance. Whether the corporation be treated as an enlarged and amplified form of partnership, and the director as managing partner, or whether he is called an agent or trustee, elected by the stockholders to represent them in the management of the concern, he occupies a fiduciary position and is essentially within the rule which requires agents, attorneys, bailees, partners, trustees, or other

fiduciaries, to exercise the highest degree of good faith as to all matters connected with the property committed to their care. . . . To say that a director who has been placed where he himself may raise or depress the value of the stock, or in a position where he first knows of facts which may produce that result, may take advantage thereof, and buy from or sell to one whom he is directly representing, without making a full disclosure, and putting the stockholder on an equality of knowledge as to these facts, would offer a premium for faithless silence, and give a reward for the suppression of truth. It would sanction concealment by one who is bound to speak, and permit him to take advantage of his own wrong—a thing abhorrent to a court of conscience. . . . When it is admitted, as it must be, both from the very nature of his duty and from the rulings of nearly all the cases, that he is trustee for the shareholder, how is it possible, in principle, to draw the line and say that, while trustee for some purposes, he is not for others immediately connected therewith? That the incidents of the trust relation stop short at the very point where it is vitally important to the shareholder that they should become active? For it must not be forgotten that the right to good faith in dealings concerning the stock is one of the very few which the individual shareholder is in a position to assert in his own name. Except in a few other instances the company itself is the only proper party to enforce the obligation arising from the trust relation of the director. In contracts with reference to the shares, the stockholder himself can enforce the rights arising from the quasi trust. . . . While not decided, it is in one case suggested that a stockholder, in dealing with a director, should recognize his superior opportunities for knowledge, and be warned thereby to exercise special caution. But the fiduciary relation fully warrants exactly the opposite course. Here, at least, the beneficiary may be off guard, and may rely implicitly not only on what is said, but also on the supposition that nothing important will be left unsaid, by the officer. Having previously

trusted the director in the management of the company, he is not required, when selling his shares, suddenly to exhibit entire want of confidence.  And directors generally recognize the obligations imposed, and act accordingly.  But the peculiar powers and special opportunities of these fiduciaries call for an enlargement rather than a restriction of the rule requiring disclosures. . . .  The obligations of his office bring him peculiarly within the general doctrine which declares that concealment of material facts may of itself amount to a fraud where from any reason one has the right to expect full information from another, or where one knows that the other is laboring under a delusion in respect to the property sold, and yet keeps silence. . . .  'A suppression of the truth may amount to a suggestion of falsehood; and if, with intent to deceive, either party to a contract of sale conceals or suppresses a material fact, which he is in good faith bound to disclose, this is evidence of and equivalent to, a false representation.' ''

In *Stewart v. Harris,* 69 Kans. 498 (66 L. R. A. 261; 105 Am. St. 178; 2 Am. & Eng. Ann. Cas. 873), the defendant was president and general manager of a bank, and bought 12 shares of stock therein, then worth $350 per share, for $116 per share, without disclosing the improved condition of the bank's affairs.  The trial court instructed the jury as follows:

''You are instructed that the president, or other managing officer of a corporation doing business as a bank, stands in relation of a trustee to all the stockholders who are not themselves engaged in the active management of the bank; and before any managing officer of a bank, who is acquainted with its condition and affairs, can rightfully purchase the stock of such bank from stockholders who are not actively engaged in the management and operation of the bank, such managing officer must inform such stockholders of the true condition of the bank and its affairs and assets, and must give to such stockholders all the information affecting the value of the stock which such managing officer himself possesses; and a

purchase, from a stockholder who is not acquainted with the condition and affairs of the bank, of his stock in such bank, by one of the managing officers, without first having informed such stockholder of the true condition of the bank and of the amount and value of its assets, is a fraud on the part of such managing officer, and renders him liable to pay the stockholder the full value of the stock, without reference to the price agreed on at the time of the sale, provided the stockholder himself does not know the value of the stock.''

This instruction was approved on substantially the grounds stated in the Georgia case from which we have quoted. In following these decisions, Doan, J., tersely states, in *Steinfeld v. Nielsen* (Ariz.), 100 Pac. 1094, what we regard as the law:

''Undoubtedly the law makes it the duty of an officer or director of a company, who is seeking to purchase from a stockholder the latter's holdings of stock, to disclose to the latter facts which have come to him by virtue of his relations to the company, and not known to the stockholder, or which may not be readily ascertained by the stockholder, and to disclose such plans and purposes as the corporation may have for the future which have a bearing upon the value of the stock of the company; but the underlying principle upon which this duty rests is that the officer or director, being the agent of a corporation, and so in a sense the agent of a stockholder, may not take advantage of the knowledge which he thus acquires, and which every member of the corporation is entitled to know, in dealing with such stockholder.''

But when the cause was again before it, the court, after the admission of Arizona as a state (139 Pac. 879), speaking through Ross, J., receded from the former holding, saying that:

''An officer or director may purchase the stock of his company from stockholders with the same freedom as a stranger, and, in so doing, the fact that he may be possessed of inside information as to the future plans and policies of his

company is not permitted to militate against him," citing the decisions heretofore mentioned and quoting the following from *Strong v. Repide,* 213 U. S. 419 (53 L. Ed. 853): "The supreme courts of Kansas and of Georgia have held the relationship existed in the cases before those courts because of the special facts which took them out of the general rule, and that under those facts the director could not purchase from the shareholder his shares without informing him of the facts which affected their value."

That the writer of the opinion in *Strong's* case was mistaken in saying that the decisions were based on special facts which took them out of the general rule clearly appears from our quotation from the Georgia case and the language of the instruction in the Kansas case. The question was left undecided in *Strong v. Repide,* though the margin of evidence held to discriminate between constructive fraud and active fraud was decidedly narrow, though enough to condemn the conclusions in *Board of Supervisors v. Reynolds,* supra, and several other decisions. That court had previously declared its position in *Jackson v. Ludeling,* 88 U. S. 616 (22 L. Ed. 492), which is clearly expressed in the syllabus as follows:

"Managers and officers of a company where capital is contributed in shares are, in a very legitimate sense, trustees alike for its stockholders and its creditors, though they may not be trustees technically and in form. They accordingly have no right to seek their own profit at the expense of the company, its shareholders, or even its bondholders."

The Supreme Court of Nebraska, in *Barber v. Martin,* 67 Neb. 445, where a director of an insurance company had bought of a confiding stockholder 18 shares of its capital stock at $50 per share, without informing her of a prospective sale at $115 per share which he made immediately thereafter, held that he was required to pay over the difference, on the principle that:

"The relation between officer and stockholder is that of

trustee and *cestui que trust*. The officer cannot use the confidence reposed in him for personal profit. If his conduct is impeached and brought under review, it will be closely scrutinized. The burden was upon Barber to show that he had dealt fairly with the stockholders, and he was inhibited by every rule of equity and fairness from taking to himself the benefit of a transaction, if that benefit was inconsistent with the faithful discharge of his trust.''

The High Court of Chancery of England, in *Walsham v. Stainton*, 66 Eng. Ch. 527 (1 De Gex, J. & S. 678), held that a fiduciary relation existed between the purchasing managers of a company and the shareholders in dealing with the stock of the latter, and that, 38 years after the transaction, the executor of the latter might recover of the purchasing manager the loss suffered. But in *Percival v. Wright*, 2 L. R. Ch. Div. (1902) 421, the contrary view was expressed, without referring to the previous decision. This led to the enactment of statutes under which directors are held to be trustees for shareholders, paid for their services rendered, and not permitted to profit in any way by information which comes to them by virtue of their positions. In *Gadsden v. Bennetto*, 23 Man. 33, the court approves *Walsham v. Stainton* and says that *Percival v. Wright* should not govern the case. The New York Court of Appeals has not passed upon the question, and a decided tendency to recede from *Carpenter v. Danforth*, supra, is manifested in the more recent decisions of the Supreme Court. In *Stark v. Soule*, 9 N. Y. St. Rep. 555, it is said that there is no legal embarrassment in the way of purchasing stock shares by a director from a stockholder, yet because of the superior knowledge of the former, slight circumstances which have the effect of misleading the seller to take less than value might afford ground for redress, and in *Von Au v. Magenheimer*, 126 App. Div. (N. Y.) 257, where plaintiff owned about one third and defendants two thirds of the stock and the latter had failed to declare a fair dividend. increased their salaries and represented that the com-

pany had suffered reverses so that it could not then pay more than 3 per cent. dividend, in order to depress the value of stock and induce plaintiff to sell for less than value, the court said:

"By wrongful acts of the defendants the plaintiff was led to think that her stock was worth less than in fact it was, and we should not indulge in hair-splitting discriminations between that kind of deceit and a fraudulent misrepresentation or concealment respecting an existing fact, in view of the relations of the parties. . If their relation was not strictly of the fiduciary character of trustee and *cestui que trust*, it was in a sense fiduciary; at least, the parties did not deal on equal terms.   Indirectly, if not actually, the defendants were the agents or trustees of the plaintiff, for in truth the entity called the corporation but represents the stockholders.   In law the two are distinct, as the stockholders own merely their shares, not the property of the corporation; but in fact, each share represents a given interest in the property of the corporation. While the defendants did not have control of the plaintiff's shares, they had control of the property represented by said shares, and their management of that property affected the value of the shares precisely as though the corporate property and the shares were one and the same.   The defendants were not under the disabilities of trustees in respect of dealings with a *cestui que trust*, but their superior position imposed upon them some duty to the plaintiff as well as to the corporation, at least the duty not to take advantage of the opportunity afforded by their position to wrong her by any affirmative act designed to injure.   Having the power to so manage the affairs of the corporation as to affect the value of her shares, they owed her the duty to refrain from intentionally abusing that power actually or apparently to depress the value of those shares for the purpose of acquiring them at an undervaluation. When they succeeded in securing her stock by that misuse of power, they committed a breach of duty to her resulting in injury, and it is immaterial that their act may also

have wronged the corporation. In view of the conditions under which business is now conducted, it will be very unfortunate if it shall be held that the duty of corporate managers in respect of their conduct of the corporate affairs is solely to the corporate entity, and that, however great a designed injury to an individual stockholder may be, he can only get redress through the corporation. The purpose of the wrong being to injure the plaintiff, that should be held to have been its effect.''

The doctrine of the nonexistence of any fiduciary relation has been severely criticized by the ablest textbook writers and merely stated by others. In the twelfth edition of Story's Equity Jurisprudence, Vol. I, p. 225, the learned author of Perry on Trusts, after stating the doctrine of nonexistence of fiduciary relationship, says:

''This seems somewhat questionable. And in such a case, where the director, either in the purchase or sale of the shares of the company gained an unequal advantage over the ordinary shareholder, it would be very natural to infer that such advantage might have been gained, more or less, by his position, and the more intimate knowledge consequent upon it unless the contrary was made very clearly to appear by the proof.''

Judge Thompson says in his commentaries on the Law of Private Corporations, Vol. 3, § 4034:

''One court (Supreme Court of Indiana, in *Commissioners v. Reynolds,* supra), has held that directors of a corporation are not trustees for individual shareholders in a sense which prohibits the directors from purchasing the shares of the shareholders without disclosing to them facts within the peculiar knowledge of the directors, which have come to their knowledge in their official capacities, which facts affect the value of the shares. This holding is believed to be unsound, and the dissenting opinion of Chief Justice Downey is to be preferred. Even where no relation of trust exists, it has been

held that the vendor is bound to disclose to the vendee facts affecting the value of the property, of which the vendee has not the equal power of acquiring a knowledge. This decision proceeds upon a conception, which, if extended, would sanction nearly all the fraud and injustice which the managers of corporations have committed against the stockholders.''

A like view appears to have been entertained by Taylor in his work on Private Corporations (5th Ed.), page 692.

Purdy's Beach on Private Corporations, (1905) states, at p. 1098, Sec. 737 a:

''When a director purchases the shares of a stockholder, concealing the fact of an impending sale of the whole plant, which nearly doubles the value of the stock, the transfer of shares may be set aside. A director, knowing the condition of the corporate affairs, before purchasing the shares of a stockholder not actively engaged in the management must inform him of the true conditions of the affairs of the corporation.''

Elliott on Private Corporations, (4th Ed., 1911) p. 678, Sec. 502, says:

''There are many authorities, however, holding that a fiduciary relation also exists between the directors and the individual stockholder. This is the better doctrine and the one sustained by the weight of authority, especially the modern cases.''

See, also, review of authorities by Prof. Wilgus in 8 Mich. Law Rev. 267, and article in 81 Cent. Law J. 256.

It is apparent from this review of the authorities that the earlier decisions turned on the question as to whether the director or officer is, in fact, a trustee with respect to the shares of stock, and the shareholder, *cestui que trust*, and that scant attention was given to the natural relation of influence on the one hand and reliance on the other existing between them. These decisions were plausibly written, and as a consequence seem to have been accepted and followed by other

courts without the consideration which otherwise would have been given the principles involved. Had that imaginary legal entity known as the corporation been regarded for the moment merely as an association of individuals investing different sums in a common enterprise, with the design of accomplishing specified purposes through those selected as directors, it would not have been so difficult to have understood the relation of confidence existing between director and shareholder, and the principles of law governing such relation probably would have been applied. Even though the relation may not technically be that of trust, the knowledge of corporate affairs coming to the managing officers through the discharge of duties entrusted to them by shareholders places them in a position to exercise influence or power in dealing in shares of capital stock, while the shareholder naturally and customarily confides in and relies upon the officers who represent him in all matters having any bearing on the value of his interest in the corporation indicated by his shares. Contrary to the numerical weight of authority, but in harmony with the light of experience and better reasoning of the more recent decisions, we are of opinion that a fiduciary relation should be held to exist between a managing officer and stockholder with relation to the latter's shares, and that any contract between them by which such officer acquires profit out of the same to the detriment of the shareholder should be held presumptively fraudulent and voidable, and the burden cast on such officer to rebut such presumption by an affirmative showing that said contract was fairly procured for value, or, if for less, upon full disclosure of all facts bearing thereon, known to such officer and unknown to the shareholder.

Had the Rawsons or Harbach, in the case at bar, merely negotiated for the sale of or sold their own stock, even though at a price commensurate with the advantages incident to a controlling interest in the corporation, no one could well have questioned their right so to do. But this was not what they

undertook to sell, or the other defendants proposed to buy. The subject of the negotiations was all the stock, though only as a means of transferring the assets and risks of the one company to the other, and the scheme to accomplish this, which was pursued, apparently was entered into by all the defendants. According to the evidence, the National Life Insurance Company, through its officers, was ready to pay about $700,000 for these assets and risks, and the jury might have found that the Rawsons and Harbach, instead of making the deal for the company and distributing the proceeds to the shareholders *pro rata*, entered into a secret arrangement with the other defendants through which to appropriate the benefits of the transfer to their own advantage, to the exclusion of the other shareholders. As held, the burden of proof was on Harbach, before buying the shares of stock of plaintiff, to make full disclosure of the pending negotiations with Johnson and his company, and if therein he was acting in pursuance of a scheme or plan in which the Rawsons had joined, such burden was alike on the executors of the estate of L. C. Rawson, deceased. The other defendants, however, may be held only upon a finding of having induced or conspired with such managing officers to perpetrate a fraud on the minority shareholders of the Des Moines Life Insurance Company in the manner described. That there was evidence sufficient to carry these several issues to the jury, the record leaves no doubt. It follows that the court erred in withdrawing the issue of constructive fraud from the jury and in directing a verdict in favor of defendant Lay and the executors of L. C. Rawson, deceased.

Our conclusion renders it unnecessary to consider other errors assigned.—*Reversed.*

All the Justices concur.