ANNIE McNEILL BIRKS et al., Appellants, v. JAS. F. McNEILL et al., Appellees.

**LIMITATION OF ACTIONS:** Setting Aside Probate of Will. Action to set aside a will is barred in five years from the time the same is duly filed for probate and notice thereof is given.

**WILLS:** Title Individually (?) or as Trustee(?)  The contention that a devisee took as trustee for others becomes immaterial when it appears that, if he did so take, he has fully executed the trust.

**TRUSTS:** Termination of Fiduciary Relation. Fiduciary relations are presumed to terminate with the execution of the trust. So held as to the turning over of stock by an executor to the *cestui que trust.*

**CORPORATIONS:** Fiduciary Relation in Purchase of Stock.  The managing officer of a corporation who buys a stockholder's stock through the stockholder's duly authorized agent is under no duty to disclose to such agent the financial condition of the corporation as bearing on the value of the stock, *when the knowledge of the agent as to the value of the stock is as ample as the knowledge of the officer who is proposing to buy.*

**LIMITATION OF ACTIONS:** Concealing Fraud not Solely Cognizable in Equity. Frauds which *must* be redressed at law, and frauds which may be redressed *either* at law or in equity, start the running of the statute of limitations when the fraud is perpetrated, irrespective of the injured party's knowledge of the fraud, except in those cases where the fraud-doer, by some affirmative and fraudulent conduct, prevents the injured party from obtaining knowledge of the fraud. But mere silence,— mere failure on the part of the fraud-doer to reveal his wrong,

when he occupies no fiduciary relation,—is not such fraudulent concealment as will toll the statute.

*Appeal from Mahaska District Court.—*JOHN F. TALBOTT, Judge.

JANUARY 17, 1919.

REHEARING DENIED APRIL 14, 1919.

SUIT in equity to compel defendants to account for and pay over to plaintiffs the difference between the par value of 800 shares of stock and its actual value. Other issues were included, not necessary to state. On hearing, the petition was dismissed.—*Affirmed.*

*W. H. Keating* and *Thomas A. Cheshire,* for appellants.

*Burrell & Devitt, L. E. Corlett,* and *William McNett,* for appellees.

LADD, C. J.—Hobart W. McNeill died testate, January 27, 1900, at the city of San Jose, California, leaving surviving Elizabeth McNeill, his widow, and an only child, Annie McNeill Birks. His will, dated November 3, 1896, bequeathing all stock in the corporation known as "McNeill Brothers, Inc.," owned by himself, to W. A. McNeill, was admitted to probate, March 13, 1900. He was owner of 2,000 of the 5,000 shares of stock in this company, and owned no other property. W. A. McNeill, who was nominated executor in the will, was appointed, and qualified as such. On the same day that the will was made, decedent had addressed to W. A. McNeill the following letter:

"Oskaloosa, Iowa, November 3, 1896.
"Wilbur A. McNeill:

"I attach this letter to my last will bearing date November 3, 1896, as instructing you what to do with the proceeds, whether dividends of cash or property or final results arising from sale of my 'McNeill Bros. stock.' One half shall

go to my wife Lizzie McNeill if  *  *  *  while living, then to my daughter Annie  *  *  *  then to her children. The other half shall go to my niece E. L. Little who has been a daughter to me nearly all her life. In the event of my death you should *at once* make a will so leaving this property. Because failing to do so it with all your own property would all go to your heirs, and both my wife and Annie would be cut out. Better make no additional will or codicil yourself without the advice of a careful lawyer as to its effect on the will made by you to-day. It is a slippery business.

"Affectionately,<br>"H. W. McNeill."

About three years later, another letter was transmitted to the same person:

"San Jose, Cal., 12-18-1899.

"Dear Wilbur:

"Having reference to my letter of instructions in yourself to govern you in the final disposition of my McNeill Bros. stock I would like to add to it this:

"Set aside five thousand dollars of McNeill Bros. stock for the use and benefit of each of the following named parties:

"Hobart M. Birks, Montreal.

"Hobart Phillips, Oskaloosa.

"Hobart Little, son of C. F. Little, Oskaloosa.

"Hobart Morris, Canmore.

"Hobart Hill, son of F. A. Hill, Seattle.

"Hobart Rice, son of Fred Rice, South Bend, Wash.

"Wilbur M. Little, Anthracite.

"Walter McNeill, Fairfax.

"The remaining amount of the two hundred thousand to be divided into two parts, one half going to my wife, Lizzie McNeill, and the other to my niece E. L. Little.

"Affectionately,<br>"H. W. McNeill."

McNeill Brothers, Inc., appears to have been organized in 1891, but certificates of the capital stock were first issued October 16, 1893, there being then issued 3,531 shares of the par value of $100 each. Two certificates, of 1,444¾ shares each, were issued to W. A. McNeill, one certificate, of 134½ shares to E. L. Little, one for 97¼ shares to J. F. McNeill, and 409¾ shares to W. T. Phillips. The capital stock was increased to $500,000, April 25, 1898. The additional certificates making up this amount were distributed to the Mc-Neills, Phillips, and others, including 65½ shares to E. L. Little, and thereafter, a certificate for 2,000 shares was issued to H. W. McNeill, February 10, 1899, upon the surrender of one certificate of 1,444¾ and another of 555½ shares previously issued to W. A. McNeill, and the cancellation thereof. In pursuance of the letters accompanying the will, and addressed to W. A. McNeill, a certificate of 800 shares of the stock held by decedent, H. W. McNeill, was issued to his widow, Lizzie McNeill, February 15, 1900. A like certificate was issued on the same day to E. L. Little, and certificates for the remainder of the 2,000 shares of stock held by said decedent were issued either to W. A. McNeill or those entitled thereto under the letters mentioned. The McNeill Bros., Inc., was a holding company for the stock in different corporations organized to carry on the various enterprises of the three brothers, Hobart W., Wilbur A., and James F. McNeill. These companies, at the time of the death of H. W. McNeill, were the American Coal Company, located at Evans, in Mahaska County, Iowa; the Oskaloosa Livery and Transfer Company, and the Oskaloosa Electric Light Company, located at Oskaloosa, Iowa; the H. W. McNeill Company which operated a coal mine at Canmore and another at Anthracite, Canada; E. L. Little Company, which operated stores at Canmore and Anthracite; the Western Coal Company; the Pacific Coast Company; and the Bren-

ton Coal Company, at Seattle, Washington.

The day after the issuance of the certificate of stock to Lizzie McNeill, one of the plaintiffs herein, she appointed W. T. Phillips, of Oskaloosa, Iowa, proxy to vote her shares in McNeill Bros., Inc. On the back of the certificate, there was a blank assignment, without date, signed by Lizzie McNeill, witnessed by her son-in-law. Shortly before March 30, 1901, W. T. Phillips made W. A. McNeill the following proposition:

"As attorney for Mrs. Lizzie McNeill I will sell you eight hundred shares of the capital stock of McNeill Bros., being certificate 14, issued February 15, 1900, for the sum of eighty thousand ($80,000.00) dollars cash, and for myself and associates, I will buy the American Coal Co., including all of its outstanding capital stock, and the American Supply Co., paying therefor the sum of seventy-five thousand ($75,000.00) dollars, as follows: I will give you 580 shares of the capital stock of McNeill Bros. and $17,000.00 cash, with the understanding that the said American Coal Co. and the American Supply Co., operating stores for supplies to coal miners, be turned over to me as of date May 1, A. D. 1901, with a clean balance sheet of that date.

"Yours truly,
"W. T. Phillips."

Subsequently, and on March 31, 1901, an option was executed in words following:

"In consideration of the sum of one dollar, in hand paid, the receipt of which is hereby acknowledged, I hereby give W. A. McNeill the exclusive option until May 1, A. D. 1901, to purchase the eight hundred (800) shares of 'McNeill Bros.' stock, as represented by Certificate No. Fourteen (14), issued February 15, A. D. 1900, and which stands in the name of Lizzie McNeill, whose attorney in fact I am, and the four hundred and nine and three quarters (409¾) shares of 'McNeill Bros.' stock as represented by Certificate No. One (1)

issued October 16, A. D. 1893, in my name, and the one hundred and seventy and one quarter (170¼) shares of 'McNeill Bros.' stock as represented by certificate of thirteen hundred and eighty (1,380) shares, upon the following conditions, to wit:

"The said W. A. McNeill shall, on or before May 1, A. D. 1901, tender me the entire amount of the outstanding stock of the corporation known as the American Coal Company, together with a clean balance sheet of said American Coal Company to that date, and the sum of sixty-three thousand dollars ($63,000.00) in cash, and in the event of his so doing, I hereby bind myself, for myself, and as the attorney of the said Lizzie McNeill, to surrender to the said W. A. McNeill the said thirteen hundred and eighty (1,380) shares of McNeill Bros. stock, and failure on the part of the said W. A. McNeill to make the said tender by the 1st day of May, A. D. 1901, shall work a forfeiture of this option after said date.

"Signed this 30th day of March, A. D. 1901.

"Witness:

"P. S. It is understood and agreed that the stock of goods at Evans, Ia., known as the American Supply Company, belongs to the American Coal Company, and is to be treated as a part of the assets of the said corporation. W. T. Phillips."

W. A. McNeill exercised his option on May 1, 1901, and took over the stock described in the foregoing instrument, and transferred the property of the American Coal Company and the American Supply Company, with the $63,000, to Phillips, who paid the plaintiff Lizzie McNeill the sum of $80,000.

Many issues are raised in the petition filed September 8, 1914. Only one appears to remain, and that concerns the transfer of the 800 shares of stock to W. A. McNeill, at about one fifth of its value, as is alleged. Plaintiffs say that a fiduciary relation existed between W. A. McNeill, as presi-

dent of McNeill Bros., Inc., and Lizzie McNeill, a share-
holder, and that the former violated his duty to make full
disclosure of value before dealing with the latter, and in
not doing so, was guilty of fraudulent concealment.

Without setting out the needlessly voluminous plead-
ings, we are of opinion that this issue, as well as that said
McNeill occupied such relation because of being executor
under the will of her husband, was raised.

It appears that there were three brothers, a sister, and
a half-sister in the McNeill family. The youngest, Hobart
W.. McNeill, was a man of large business capacity, possess-
ing a genius for promotion, especially in mining enterprises
His brothers, W. A. and James F. McNeill, were men of
ordinary ability, and it is likely that they acquired riches
through the sagacity and foresight of Hobart. The sister
married one Little, one of whose children was E. L. Little.
Hobart was married to the plaintiff Lizzie McNeill in 1869.
He appears to have undertaken to practice law for several
years, then developed into a telegraph operator, and later
became owner and manager of coal mined in Mahaska
County. After serving as assistant manager of the Chicago,
Milwaukee & St. Paul Railroad Company for a time, and
thereafter residing in Austin, Texas, and Long Beach, New
Jersey, he returned to Oskaloosa in 1883, where he erected
a dwelling, and resided until 1886. Two children were born
to them, one dying in infancy, and the other, one of the plain-
tiffs in this suit, Annie McNeill Birks, was born in 1873.
In 1884 or 1885, E. L. Little, his niece, became the stenogra-
pher or secretary of H. W. McNeill. He had previously paid
her expenses for two years at a boarding school, and for
a course at a business college. She accompanied him to Chi-
cago and Newark, New Jersey, where he was engaged in
some business enterprises, and in 1886, to Seattle, Washing-
ton, where, save for a short time at Anthracite, Canada, he
resided until his death, and she continued as his secretary.

The daughter attended school at Boston, Massachusetts, during five years, her mother accompanying her. They passed the summers at Oskaloosa, except that of 1889 or 1890, when they visited H. W. McNeill at Seattle. In 1896, he purchased 35 acres of land at the tip of a peninsula extending into Lake Washington, and constructed thereon a large dwelling house and gardens suitable to the situation, at an expense of $30,-000, called the place Colonsay, and took title in the name of E. L. Little. Mrs. McNeill visited him there for some two or three weeks, in 1897 or 1898. He had not been in good health, though continuing to transact business, since 1888, and was seriously ill during the nine months preceding his death. Mrs. McNeill went to Seattle, during this last period, to see her husband, and remained at a hotel for a couple of weeks, in attempting to do so. W. A. McNeill met her at the train, and subsequently, with the assurance that her husband was so feeble that a visit by her would be injurious to his health. The attending physician testified that, at the instance of W. A. McNeill and E. L. Little, he confirmed this statement to her, and, after several fruitless efforts to see her husband, she returned to Montreal without doing so. Mrs. Williams, nee E. L. Little, denied having been a party to this transaction.

Mrs. McNeill, with her daughter, had continued to reside at Oskaloosa until the marriage of the latter to John Henry Birks, in 1894, and thereafter resided with the daughter at Montreal. She seems to have been with her husband about three months, altogether, in Seattle. The home, known as Park Place, at Oskaloosa, was in her name, and of the value of $10,000. Some time in 1898 or 1899, decedent invited his daughter, with her son, to visit him; but, when about to go, she received a telegram, stating that the house had been closed. Both Mrs. McNeill and her daughter testified that the relations between H. W. McNeill and his wife, and also between him and his daughter, were agreeable at

all times, and that he occasionally visited them at Montreal. He had contributed $15,000 toward procuring the daughter a home, her husband's father doing likewise, and at one time, he tendered her a check for $50,000, which she refused, saying that he could invest it better. That he entertained an affectionate regard for his daughter and grandson, the record leaves no doubt. It is equally conclusive that he was somewhat estranged from Mrs. McNeill. She had been in ill health, about 25 years, and suffered a stroke of apoplexy in 1892. They seemed to have been content to live apart, for a long period prior to his death. The efficiency of E. L. Little in assisting this uncle in the transaction of his business is fully proven, as is the fact that she took care of him during his long illness. Whether she was paid a salary of $250 per month for such services, or, as she testified, received no regular salary, is not very material, save as bearing on his apparent liberality in bestowing on her Colonsay and 200 shares of stock in McNeill Bros., Inc., and, after his death, an amount of stock equal to that left his wife, and through her, to the daughter. She explained that decedent had told her that:

"If I had remained at home I would have been married and would have had a home of my own, which was true, and that he felt that he should do that for me because I had been with him a good many years."

He had also given her his diamond ring, shortly before his death. The circumstance that his daughter had married into a family of great wealth probably was accorded some consideration in disposing of his estate. Such are the facts, and we may now dispose of the issues.

I.  The daughter of H. W. McNeill was not remembered in his will or letters, save in the suggestion that the portion left to his wife would ultimately pass to her and her heirs.

The will was admitted to probate on March

**1. LIMITATION OF ACTIONS: setting aside probate of will.** 13, 1900, and the estate fully settled December 16, 1901. This was conclusive as to the execution of the will, until set aside. Section 3296 of the Code. Any action to set aside the will was barred in five years from the time it was filed, so that any claim she may have was completely barred by the statute of limitations. *Willard v. Wright*, 81 Iowa 714; *Kelly v. Kelly*, 158 Iowa 56. We are not sure that Annie McNeill Birks makes any definite claim in the petition, and we pass on this as the only one under which she might demand a share in the property devised to W. A. McNeill. It follows that, as to her, the petition was rightly dismissed.

II.  Shortly after the funeral of H. W. McNeill, W. A. McNeill went to the house of W. T. Phillips, where the widow and daughter were staying, and there read the will and

**2. WILLS: title individually (?) or as trustee (?)** what he termed the codicil, to those present. The record leaves no doubt that what he read in connection with the will was the letter heretofore set out, directing what he should do with the stock, and that this was the paper designated by him as the codicil. Counsel for appellant argued that the will, in connection with the letters, constituted him a trustee, and that the title to the stock would not pass to W. A. McNeill under the will. Conceding, without deciding this, it is to be said that the trust, if such there was, has been fully and completely executed. If he took title as trustee, then it was to transfer the stock, as in the letter directed; and the evidence is undisputed that he caused to be issued a certificate of the 800 shares of stock to Mrs. NcNeill, February 15, 1900, nearly a month before the will was admitted to probate, and issued a certificate of a like amount of stock to E. L. Little on the same day, and also either caused to be issued to himself, as trustee for the eight minors who had been named by the decedent, certificates of

stock, or directly to the minors, at that time. It is quite immaterial to the determination of this case whether he so did voluntarily, to meet the wishes of his brother as expressed in the letter, or as trustee, with the duty of so doing imposed upon him. The trust, if any existed, was fulfilled, and no duty remained to be performed by the alleged trustee.

III.  W. A. McNeill qualified as executor March 14, 1900; and, as to any property he acquired as executor, and which belonged to or to which Mrs. McNeill would become entitled, he was undoubtedly to be regarded

3. TRUSTS: termination of fiduciary relation.

as trustee, and she, a *cestui que trust*. But all that she could be held to have been entitled to, i. e., the 800 shares of stock, passed to her, and after that, he then ceased to be trustee. Though the courts will scrutinize the transactions between an administrator and those entitled to the property of the decedent closely, even after the property has been turned over to those entitled thereto, in the absence of any additional showing, the relation of the executor or administrator to such property is not to be regarded as that of trustee. In the absence of circumstances showing the contrary, the fiduciary relationship ceased with the delivery of the property, and the executor or administrator is no longer a trustee with respect thereto. After the issuance of these certificates, the executor and Mrs. McNeill had no dealings whatever, and there is no ground for saying that, when W. A. McNeill purchased her shares of stock, a year later, he occupied a fiduciary relationship because of his being the executor of the estate.

IV.  Negotiations for the purchase of the 800 shares of stock of Mrs. McNeill began with the proposition of W. T. Phillips as her agent or attorney. The contract giving W. A. McNeill an option to purchase was

4. CORPORATIONS: fiduciary relation in purchase of stock.

dated March 30, 1901, and it extended to May 1st of that year. McNeill elected, on the last day, to make the purchase, and it

appears to have been consummated eight days later, by the assignment of the certificate of stock and its cancellation. McNeill, at that time, was president of the corporation, and Mrs. McNeill, a stockholder; and it is contended that he, as director and president of the corporation, owed her, as a shareholder, the duty of making a full disclosure of the financial condition of the corporation, as bearing upon the value of her shares of stock, before purchasing same of her; and that this he failed to do, as was his duty; and that, therefore, he should be held to account for the difference between the amount paid for these shares of stock and what they were actually worth at the time. In other words, it is contended that the doctrine of *Dawson v. National Life Ins. Co.,* 176 Iowa 362, should be applied.

The trouble with this contention is that Mrs. McNeill acted through W. T. Phillips as her agent, as appears to be conceded in argument, and, of course, his knowledge with respect to the transaction would be imputed to her. He had been a director of McNeill Bros., Inc., from the date of its organization, and then held 580 shares of its stock. On February 27, 1900, he was elected secretary and manager, and continued such until he resigned because of the transfer or cancellation of such stock in acquiring the American Coal Company in May, 1901. He testified that he "left the employ of McNeill Bros., January 24, 1900." James F. McNeill fixed the date as April 30, 1901. Phillips probably referred to work in the office of McNeill Bros., Inc., as he became manager of the American Coal Company at about the date mentioned by him. He had been associated with the brothers in one capacity or another for nearly 30 years. He was aware that McNeill Bros., Inc., was merely a holding company, and knew of all the companies the stock in which was held by McNeill Bros., Inc., and testified that he knew the value of the properties owned by the respective corporations. The books were open to his inspection

quite as freely as to the president of the corporation; and certainly, as to him, the doctrine of the *Dawson* case has no application. He either knew or had quite as good an opportunity for ascertaining the values of these several properties as did the president, and cannot be said to have occupied the position of a mere shareholder. We are not saying that he actually knew what the several properties were worth. He seems to have placed much reliance upon the reports coming in to McNeill Bros., Inc., and its books, and testified therefrom in connection with his inspection of the several properties. It is doubtful whether any of the officers fully realized their respective values, and it is doubtful whether W. A. McNeill was then any better informed than was W. T. Phillips, the agent of the plaintiff, concerning what the stock of this company was worth. Undoubtedly, as subsequent events disclosed, the shares transferred by Mrs. McNeill were of much greater value than was paid for them. According to the testimony of James F. McNeill, who was treasurer of the company during the 9½ years prior to the selling of the stock, the dividends averaged less than 6 per cent per annum. From the time of its organization until 1910, 19 years, these were a little less than 15 per cent per annum. W. A. McNeill was not active in the negotiations. The proposition was made by Phillips, and it was Phillips who gave an option to McNeill if he desired to purchase; and for all that appears, McNeill proceeded on the theory that he was dealing with a director of the company, acting for himself and as agent for Mrs. McNeill. Between these no fiduciary relation existed; and, as Mrs. McNeill dealt through this director, we are inclined to the view that she is in no better situation, and cannot be heard to complain of the omission of W. A. McNeill to advise Phillips concerning the condition of the company. What our conclusion might have been had Phillips acted without authority, we have no occasion to suggest.

If, however, a fiduciary relation were found to exist because of the relation of president and directors of McNeill Bros., Inc., any claim for damages was barred by the statute of limitations.

V. The defendants pleaded that action was barred by Paragraph 6 of Section 3447 of the Code, declaring that suit "for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery

5. LIMITATION OF ACTIONS: concealing fraud not solely cognizable in equity.

* * * [must be brought] within five years" after the cause of action accrued. Code Section 3448 provides that:

"In actions for relief on the ground of fraud or mistake, and those for trespass to property, the cause of action shall not be deemed to have accrued until the fraud, mistake or trespass complained of shall have been discovered by the party aggrieved."

The fraud contemplated in this section has uniformly been held to be that "heretofore solely cognizable in a court of chancery." *Phoenix Ins. Co. v. Dankwardt*, 47 Iowa 432. If the action is at law, or the remedy is concurrent, the section has no application. *McGinnis v. Hunt*, 47 Iowa 668; *Carrier v. Chicago, R. I. & P. R. Co.*, 79 Iowa 80; *McKay v. McCarthy*, 146 Iowa 546. If, however, the party against whom the cause of action exists, by fraud or fraudulent concealment prevents such other from obtaining knowledge thereof, the statute will commence to run from the time the right of action is discovered, or might, in the exercise of reasonable diligence, be discovered. *District Twp. of Boomer v. French*, 40 Iowa 601; *Faust v. Hosford*, 119 Iowa 97; *Caffee v. Berkley*, 141 Iowa 344. The shares of stock were transferred to W. A. McNeill or to the company, and canceled prior to May 8, 1901. Phillips, as agent of Mrs. McNeill, and probably she, as well, was aware that McNeill Bros., Inc., was a holding corporation,—merely holding the stock of other corporations,—and that it was engaged in

no business except through other companies.   Thereafter, the different corporations were operated as before, at least until disposed of, books were kept thereby, and reports made to McNeill Bros., Inc., remittances or deposits made by the several companies with the holding company, and moneys drawn therefrom.   The books and papers, throughout all the years following the sale of the stock, were accessible. No claim of the perpetration of fraud by W. A. McNeill prior to his death, on November 6, 1913, was made.   No relations, business or social, between him and the widow of H. W. McNeill or the daughter occurred after the sale of the stock.   In fact, no effort whatever to conceal or cover up the transactions appears to have been made, and there is no showing whatever of any concealment of the alleged cause of action during over 13 years which elapsed between the sale of the stock and the beginning of this suit.   It is argued, however, that, under the ruling of the last cited cases, W. A. McNeill fraudulently concealed the cause of action until about the time this suit was begun.   If this was done, it was by silence throughout this long period.   But his relation of quasi trustee toward the shareholder ceased with the transaction, and he was under no more obligation to confess the wrong, if one were perpetrated, than any other wrongdoer. The omission to disclose the facts while the trust relation existed was of the essence of the fraud alleged to have been perpetrated.   This duty to disclose was not a continuing one, and to say that McNeill's silence amounted to fraudulent concealment would wipe out the limitation, by ruling that the vital element of the alleged fraud tolled the statute, and rendered it possible to maintain an action at any time during the silence of the wrongdoer, though that were the wrong necessarily in connection with the sale of the stock making up the cause of action.

In the cases last above cited, the agent had committed a fraud on his principal, and, of course, his silence as to what

he had done was a continuing breach of the duty of disclos-ing to his principal what he had done. Here, the relation-ship of the parties ended with the transaction. The breach of any duty owed to the shareholder was complete, and no obligation or liability rested on the president, other than that of restoring the difference in the value of the stock and the amount paid therefor. The cause was maintainable in law or equity, and we are of opinion that there was no fraud-ulent concealment tolling the statute under Section 3448 of the Code, and that the cause of action is barred by the stat-ute of limitations.—*Affirmed.*

EVANS, GAYNOR, SALINGER, and STEVENS, JJ., concur.